**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| In re: LANTUS DIRECT PURCHASER ANTITRUST LITIGATION | Civil Action No. 1:16-cv-12652-LTS-JCB<br>**REDACTED**<br>**Leave to File Granted on 09/30/2026** |

**PURCHASERS' OPPOSITION TO SANOFI'S MOTIONS *IN LIMINE***

## TABLE OF CONTENTS


I. INTRODUCTION ....... 1

II. LEGAL STANDARD ....... 2

III. ARGUMENT ....... 3

A. Opposition to Sanofi's MIL No. 1: To Preclude Evidence of, Reference to, or Argument Regarding Alternative Liability Theories ....... 3

1. The broad categories Sanofi seeks to exclude include highly relevant evidence and argument ....... 4

2. The evidence and argument Sanofi identifies is not unfairly prejudicial. ....... 12

B. Opposition to Sanofi's MIL No. 2: To Preclude Evidence of, Reference to, or Argument Regarding Post-Listing Legal Developments ....... 14

1. The "post-listing legal developments" show Sanofi's position to be objectively unreasonable and without any regulatory legitimation. ....... 16

2. The Court must consider the appellate decisions construing the listing statute, and the purchasers should be able to use them to confront witnesses who contradict them. ....... 19

3. The Court must consider the FTC's actions and FDA's support, which are also admissible to test Sanofi's witnesses and to rebut its claim of regulatory legitimation ....... 25

4. Rule 403 and Sanofi's cases do not support a categorical bar. ....... 29

C. Opposition to Sanofi's MIL No. 3: To Preclude Evidence of, Reference to, or Argument Regarding Injury or Harm to Patients and Consumers ....... 31

D. Opposition to Sanofi's MIL No. 4: To Preclude Evidence of, Reference to, or Argument Regarding Sanofi's "Lobbying" Activities Concerning State Pharmacy-Level Substitution ....... 35

E. Opposition to Sanofi's MIL No. 5: To Preclude the Use of Prejudicial Words ....... 37

F. Opposition to Sanofi's MIL No. 6: To Preclude Any Negative or Adverse Inference Based on Sanofi's Invocation of Privilege ....... 40

IV. CONCLUSION ....... 45

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Akamai Techs., Inc. v. Limelight Networks, Inc.*,
614 F. Supp. 2d 90 (D. Mass. 2009) ....................45

*Apotex, Inc. v. Thompson*,
347 F.3d 1335 (Fed. Cir. 2003)....................16, 18

*Astra Pharm. Prods., Inc. v. Beckman Instruments, Inc.*,
1983 WL 51933 (D. Mass. Mar. 24, 1983), *aff'd*, 718 F.2d 1201 (1st Cir. 1983) ....................45

*Cheek v. United States*,
498 U.S. 192 (1991)....................24

*CPC Int'l, Inc. v. Northbrook Excess & Surplus Ins. Co.*,
144 F.3d 35 (1st Cir. 1998)....................3, 29

*CureVac SE v. BioNTech SE*,
No. 2:23-cv-00222, Doc. No. 794 (E.D. Va. Feb. 24, 2025)....................38

*Deselms v. Occidental Petroleum Corp.*,
2024 WL 4103603 (D. Wyo. July 29, 2024) ....................32

*In re Epipen Marketing, Sales Practices & Antitrust Litig.*,
2021 WL 6072512 (D. Kan. Dec. 23, 2021)....................13

*Fusco v. Gen. Motors Corp.*,
11 F.3d 259 (1st Cir. 1993)....................3

*FWK Holdings LLC v. Takeda Pharm. Co.*,
No. 1:21-cv-11057, Doc. No. 763 (D. Mass. Apr. 11, 2026) ....................32, 38, 39

*Helios Software, LLC v. Spectorsoft Corp.*,
2015 WL 3653098 (D. Del. May 22, 2015)....................30

*In re HIV Antitrust Litig.*,
2023 WL 5670808 (N. D. Cal. Mar. 19, 2023)....................32, 42, 45

*Illinois Brick Co. v. Illinois*,
431 U.S. 720 (1977)....................33

*Implicit, LLC v. NetScout Sys., Inc.*,
2019 WL 6873030 (E.D. Tex. Nov. 21, 2019) ....................30

*In re Intuniv Antitrust Litig.*,
2021 WL 10362709 (D. Mass. Mar. 3, 2021)....................................................33, 34, 38

*In re Keeper of Records (Grand Jury Subpoena Addressed to XYZ Corp.)*,
348 F.3d 16 (1st Cir. 2003)..........................................................................................44

*King Drug Co. of Florence, Inc. v. Cephalon, Inc.*,
2016 WL 5929051 (E.D. Pa. Jan. 21, 2016)...................................................................34

*In re Lantus Direct Purchaser Antitrust Litig.*,
512 F. Supp. 3d 106 (D. Mass. 2020)..............................................................................5

*In re Lantus Direct Purchaser Antitrust Litig.*,
950 F.3d 1 (1st Cir. 2020)........................................................................................ *passim*

*In re Lidoderm Antitrust Litig.*,
2016 WL 4191612 (N.D. Cal. Aug. 9, 2016) ..................................................................44

*In re Loestrin 24 Fe Antitrust Litig.*,
2019 WL 13257216 (D.R.I. Dec. 6, 2019) ....................................................................33

*Maroney v. Fiorentini*,
732 F. Supp. 3d 127 (D. Mass. 2024)........................................................................29, 30

*Mass Engineered Design, Inc. v. SpaceCo Bus. Sols., Inc.*,
2017 WL 4334075 (D. Colo. May 2, 2017)....................................................................30

*MCI Commc'ns Corp. v. AT&T Co.*,
708 F.2d 1081 (7th Cir. 1983) ...................................................................................21, 23

*MCI Telecomms. Corp. v. FCC*,
561 F.2d 365 (D.C. Cir. 1977).......................................................................................21

*Monahan's Marine, Inc. v. Boston Whaler, Inc.*,
866 F.2d 525 (1st Cir. 1989)..........................................................................................32

*Mylan Pharmaceuticals Inc. v. Sanofi-Aventis U.S. LLC*,
No. 2:23-cv-00836-MRH, ECF No. 1 () (W.D. Pa. May 17, 2023) ...............................11

*Mylan Pharms. Inc. v. Sanofi-Aventis U.S. LLC*,
No. 23-cv-00836, ECF No. 61-3 (W.D. Pa. Nov. 20, 2023) ..........................................19

*N. Am. Soccer League LLC v. United States Soccer Fed'n, Inc.*,
2024 WL 2959967 (E.D.N.Y. June 12, 2024). ...............................................................34

N. Am. Soccer League LLC v. United States Soccer Fed'n, Inc., 2026 WL
1397077 (2d Cir. May 19, 2026) .....................................................................................34

*In re Namenda Direct Purchaser Antitrust Litig.*,
2019 WL 6242128 (S.D.N.Y. Aug. 2, 2019) ....................33

*In re Nexium (Esomeprazole) Antitrust Litig.*,
842 F.3d 34 (1st Cir. 2016) ....................7, 34, 41

*In re Nexium (Esomeprazole) Antitrust Litig.*,
968 F. Supp. 2d 367 (D. Mass. 2013) ....................32

*Ortiz-Graulau v. U.S.*,
756 F.3d 12 (1st Cir. 2014) ....................22

*Phonetele, Inc. v. AT&T Co.*,
664 F.2d 716 (9th Cir. 1981) ....................20

*Pierce v. Underwood*,
487 U.S. 552 (1988) ....................23

*Rivera-Torres v. Ortiz Velez*,
341 F.3d 86 (1st Cir. 2003) ....................4

*Rivers v. Roadway Express, Inc.*,
511 U.S. 298 (1994) ....................22

*Roth v. Wiese*,
2005 WL 8175921 (D. Neb. Aug. 22, 2005) ....................30

*S. Pac. Commc'ns Co. v. AT&T Co.*,
740 F.2d 980 (D.C. Cir. 1984) ....................22

*Safeco Ins. Co. of Am. v. Burr*,
551 U.S. 47 (2007) ....................23

*Sanofi-Aventis Deutschland GmbH v. Mylan Pharms. Inc.*,
2021 WL 6137374 (Fed. Cir. Dec. 29, 2021) ....................13

*Sanofi-Aventis Deutschland GmbH v. Mylan Pharms. Inc.*,
2021 WL 6137375 (Fed. Cir. Dec. 29, 2021) ....................13

*Sanofi-Aventis Deutschland GMBH v. Mylan Pharms. Inc.*,
791 F. App'x 916 (Fed. Cir. 2019) ....................13

*In re Solodyn (Minocycline Hydrochloride) Antitrust Litig.*,
No. 1:14-md-02503, Doc. No. 1089 (D. Mass. Mar. 8, 2018) ....................33, 34

*Sprint/United Mgmt. Co. v. Mendelsohn*,
552 U.S. 379 (2008) ....................3, 12

*Teva Branded Pharm. Prods. R&D, Inc. v. Amneal Pharms. of N.Y., LLC*,
124 F.4th 898 (Fed. Cir. 2024) ............................................................................ *passim*

*Teva Branded Pharm. Prods. R&D, Inc. v. Amneal Pharms. of N.Y., LLC*,
2024 WL 2923018 (D.N.J. June 10, 2024) ..................................................................17

*Trammel v. United States*,
445 U.S. 40 (1980)..........................................................................................................45

*United States v. Amaya-Manzanares*,
377 F.3d 39 (1st Cir. 2004)..............................................................................................38

*United States v. Brown*,
669 F.3d 10 (1st Cir. 2012)................................................................................................3

*United States v. Burgess*,
576 F.3d 1078 (10th Cir. 2009) ........................................................................................38

*United States v. Cruz-Ramos*,
987 F.3d 27 (1st Cir. 2021)................................................................................................2

*United States v. Felton*,
417 F.3d 97 (1st Cir. 2005)..............................................................................................40

*United States v. Glover*,
2025 WL 1580848 (S.D.N.Y. June 3, 2025) .....................................................................39

*United States v. Laboy*,
909 F.2d 581 (1st Cir. 1990)..............................................................................................5

*United States v. Noah*,
130 F.3d 490 (1st Cir. 1997)..............................................................................................3

*United States v. Rathbun*,
98 F.4th 40 (1st Cir. 2024)..................................................................................................2

*United States v. Ross*,
171 F.4th 522 (1st Cir. 2026)..............................................................................................2

*United States v. Soler-Montalvo*,
44 F.4th 1 (1st Cir. 2022)....................................................................................................2

*United States v. Tetioukhine*,
725 F.3d 1 (1st Cir. 2013)....................................................................................................3

*United States v. Williams*,
717 F.3d 35 (1st Cir. 2013)................................................................................................12

*Upjohn Co. v. United States*,
449 U.S. 383 (1981)........................................................................................45

*USFL v. NFL*,
634 F. Supp. 1155 (S.D.N.Y. 1986).....................................................................36

*Velez v. Marriott PR Mgmt.*,
590 F. Supp. 2d 235 (D.P.R. 2008)......................................................................38

*Walker v. Analog Devices, Inc.*,
2024 WL 4190856 (1st Cir. May 30, 2024)..........................................................32

*Williams v. Drake*,
146 F.3d 44 (1st Cir. 1998)..................................................................................38

*In re Zetia (Ezetimibe) Antitrust Litig.*,
2023 WL 4156858 (E.D. Va. Apr. 5, 2023) ..................................................32, 38, 42

**Other Authorities**

Antitrust Division, U.S. Dep't of Justice, Federal Antitrust Crime: A Primer for
Law Enforcement Personnel, at 4–5, 7–10 (Oct. 2023).............................................39

Cambridge Dictionary...........................................................................................39

Fed. R. Civ. P. 37(c)(1)........................................................................................44

Fed. R. Evid. 401 ................................................................................................33

Fed. R. Evid. 705 ................................................................................................24

Fed. R. Evid. 403 ..................................................................................................2

## I. INTRODUCTION

Sanofi's motions *in limine* would allow Sanofi to present its defenses while barring the purchasers from answering with relevant, admissible evidence. For example, Sanofi plans to argue that, apart from the improperly listed pen patents, two *other* patents (relating to the addition of polysorbate to Lantus *vials* of insulin but not to Lantus *pens*) were the sole, true cause of the 30-month stays imposed on Lilly and Merck. Yet Sanofi seeks to exclude evidence showing those patents were held invalid and improperly listed in the Orange Book for Lantus pens (MIL No. 1). Sanofi plans to argue that the listing statute was ambiguous and that the U.S. Food and Drug Administration ("FDA") acquiesced to improper device-patent listings. Yet it seeks to exclude appellate decisions construing that statute and regulators' condemnation of the listing practice its experts invoke (MIL No. 2). Sanofi plans to argue that the limited uptake of Lilly's competing insulin product undermines the purchasers' market definition and damages model, but it seeks to exclude evidence that Sanofi worked to limit that uptake (MIL No. 4). And it asks the jury to credit the legal advice it chose to disclose through a selective and inconsistently applied waiver while forbidding any mention of the advice it withheld (MIL No. 6). These invitations to reversible error should be denied.

Sanofi's remaining motions simply seek too much. The purchasers will not appeal to jurors as consumers to inflame passions, but consumer harm is core to the Sherman Act, and the jury is entitled to context about the Hatch-Waxman Act and the pharmaceutical industry (MIL No. 3). Nor can Sanofi bar words like "improper," "mistake," and "scheme," which the First Circuit and this Court have used to describe Sanofi's conduct in this case (MIL No. 5). The purchasers are not trying sham-litigation, serial-petitioning, or product-hopping *theories of liability* (MIL No. 1). But Sanofi cannot convert that narrowing into the exclusion of *evidence* central to the claim being tried: that Sanofi improperly listed the pen patents in the Orange Book

to exclude its competitors from the market. The motions should be denied or, where appropriate, deferred to trial.

## II. LEGAL STANDARD

Relevance "is a very low threshold that only requires the tendered evidence to move the inquiry forward to some degree."[1] Evidence that is "background in nature" meets that standard as readily as any other; it "is universally offered and admitted as an aid to understanding."[2] Courts may exclude relevant evidence under Rule 403 only "if its probative value is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."[3] "In balancing the scales of Rule 403, it is important to note that only *unfair* prejudice is to be avoided, as, by design, all evidence is meant to be prejudicial."[4] The prejudice must also *substantially* outweigh the probative value: "it is not enough for Rule 403 that the evidence's dangers of unfair prejudice or confusion *somewhat* outweigh the probative value of the evidence."[5] The "standard for exclusion under Rule 403 is a high one," and "the default rule is that relevant evidence will be admitted."[6]

The posture of a motion *in limine* matters as well. "Relevance and prejudice under Rules 401 and 403 are determined in the context of the facts and arguments in a particular case, and thus are generally not amenable to broad *per se* rules." Applying Rule 403 "requires a

---

[1] *United States v. Rathbun*, 98 F.4th 40, 51 (1st Cir. 2024) (cleaned up).

[2] *United States v. Cruz-Ramos*, 987 F.3d 27, 42 (1st Cir. 2021) (quoting Fed. R. Evid. 401 Advisory Committee's Note).

[3] Fed. R. Evid. 403.

[4] *United States v. Ross*, 171 F.4th 522, 530 (1st Cir. 2026) (quoting *United States v. Morales-Aldahondo*, 524 F.3d 115, 119–20 (1st Cir. 2008)) (emphasis added).

[5] *United States v. Soler-Montalvo*, 44 F.4th 1, 16 (1st Cir. 2022) (citing *United States v. Trenkler,* 61 F.3d 45, 56 (1st Cir. 1995) and quoting Fed. R. Evid. 403) (emphasis modified).

[6] *Id.* (citing *United States v. Fahey*, 769 F.2d 829, 841 (1st Cir. 1985) and *United States v. Jones*, 689 F.3d 12, 19 (1st Cir. 2012)).

fact-intensive, context-specific inquiry."[7] That is why courts often adopt a "wait-and-see" approach to avoid making "judgment calls about admissibility *a priori* and out of context."[8] "[M]any issues are best resolved in context and only when finally necessary."[9] This is particularly appropriate where, as with most of Sanofi's motions, a party asks the Court to exclude an entire subject while reserving the right to present its own side of that subject. A party that opens the door cannot shut out contrary evidence.[10] Where admissibility turns on what Sanofi chooses to argue, the appropriate course is to defer deciding the motion to when the Court will have "the look and feel of the trial before [it]."[11]

## III. ARGUMENT

### A. Opposition to Sanofi's MIL No. 1: To Preclude Evidence of, Reference to, or Argument Regarding Alternative Liability Theories

Sanofi's MIL No. 1 rests on a fundamental mistake. There is a difference between an unadvanced *theory of liability* and *evidence* relevant to the remaining theory in the case and defenses to it. Sanofi ignores this.

To be sure, over the course of this nearly decade-long litigation, the purchasers have dropped some theories of liability. Others, they never alleged. We now pursue a single, compelling scheme of monopolization. It goes like this: Sanofi improperly listed pen patents in the Orange Book for Lantus SoloStar and triggered 30-month stays by suing Lilly and Merck for infringing them. As a matter of law, to bring follow-on versions of insulin glargine pens to

---

[7] *Sprint/United Mgmt. Co. v. Mendelsohn*, 552 U.S. 379, 387–88 (2008).

[8] *United States v. Noah*, 130 F.3d 490, 496 (1st Cir. 1997).

[9] *Fusco v. Gen. Motors Corp.*, 11 F.3d 259, 263 (1st Cir. 1993).

[10] *United States v. Tetioukhine*, 725 F.3d 1, 9 (1st Cir. 2013) (describing the opening-the-door doctrine); *see also United States v. Brown*, 669 F.3d 10, 24 (1st Cir. 2012).

[11] *CPC Int'l, Inc. v. Northbrook Excess & Surplus Ins. Co.*, 144 F.3d 35, 45 (1st Cir. 1998).

market, Lilly and Merck needed only certify to patents listed in the Orange Book for Lantus SoloStar (*see* Purchasers' MIL No. 10). As a matter of fact, (i) the only patents listed in the Orange Book for Lantus SoloStar when Lilly and Merck had to make their respective certifications were pen patents and (ii) FDA referred to the pen patents as a basis for imposing 30-month stays. The purchasers' proposed jury instructions and verdict form reflect that sole remaining theory. And so, Sanofi needs no further relief to ensure that other *liability theories* are not pursued.

Sanofi's motion is really an effort to sweep out evidence critical to rebutting Sanofi's defenses that *are* part of the case.[12] Because Sanofi intends to open the door, it cannot insulate those defenses from attack by precluding the purchasers' rebuttal. Sanofi's MIL No. 1 should either be denied in its entirety now or reserved for decision until the purchasers actually seek to introduce the kind of evidence Sanofi seeks to preclude.

**1. The broad categories Sanofi seeks to exclude include highly relevant evidence and argument.**

Sanofi identifies several broad, ill-defined buckets of "evidence" that it ties to "alternative liability theories," and argues that because this evidence would have been relevant to theories the purchasers are not pursuing, the evidence must be treated as categorically irrelevant to the theory and defenses that remain in the case. But even if some evidence would have been relevant to some abandoned theory, that does not mean it is irrelevant to the case that remains.[13]

[12] Doc No. 724 at 2–12 (Sanofi's Br.).

[13] *Rivera-Torres v. Ortiz Velez*, 341 F.3d 86, 98 (1st Cir. 2003) ("The district court's prerogative to admit evidence of dismissed claims insofar as it provides relevant background for surviving claims is firmly established by our precedents . . . .").

And what Sanofi seeks to exclude here is compelling evidence that would directly "contradict or disprove" defenses that Sanofi has raised to avoid liability on the remaining theory.[14]

***The merits and subjective motivation of Sanofi's previous lawsuits.*** The purchasers will not argue that Sanofi is liable under a theory of sham litigation, nor will we characterize Sanofi's lawsuits against Lilly as "objectively baseless."[15] However, the fact that Sanofi's litigation was "subjectively motivated by a desire to quell competition" is relevant to rebut Sanofi's anticipated defenses.[16] By advancing a regulatory compliance defense, Sanofi puts at issue whether it engaged in the challenged conduct in good faith.[17] That challenged conduct is submitting the pen patents for listing in the Orange Book *and* triggering the 30-month stay by suing on listed patents within 45 days.[18] Thus, evidence that Sanofi's subjective motivation for suing Lilly and Merck was to thwart competition is highly probative.

***Validity, enforceability, and infringement of the pen or polysorbate vial patents.*** Sanofi claims that the pen and polysorbate vial patents' validity is irrelevant.[19] In many respects, the purchasers agree. Indeed, the purchasers have moved the Court to enforce the existing joint

---

[14] *United States v. Laboy*, 909 F.2d 581, 588 (1st Cir. 1990) ("Rebuttal evidence may be introduced to explain, repel, contradict or disprove an adversary's proof . . . .") (citing *United States v. Wright*, 573 F.2d 681 (1st Cir. 1978)).

[15] *Contra* Doc. No. 724 at 5 (Sanofi's Br.).

[16] *Id.* (cleaned up).

[17] *See In re Lantus*, 950 F.3d 1, 12–13 (1st Cir. 2020).

[18] *In re Lantus Direct Purchaser Antitrust Litig.*, 512 F. Supp. 3d 106, 111 (D. Mass. 2020) (noting that the purchasers allege "that Sanofi carried out [its anticompetitive] scheme by improperly listing patents in the [Orange Book] and then taking advantage of its consequent right to file patent infringement actions against aspiring competitors in an effort to block competition before any competing product reached the market").

[19] Doc. No. 724 at 5–6 (Sanofi's Br.).

stipulated order *in limine*[20] and to exclude Sanofi from raising the presumptive validity of its patents, or arguments that Lilly or Merck would have perceived Sanofi's pen patents as threats or barriers to launching as a defense in the first instance.[21] But if Sanofi is allowed to argue or suggest that its patents are or were valid or infringed, the purchasers' evidence to the contrary is necessarily relevant. Sanofi's effort to introduce evidence about the pen and polysorbate vial patents' professed legitimacy as a causation defense, while simultaneously excluding the purchasers' rebuttal evidence on that topic, is manifestly self-serving.

Likewise, the Court should exclude the polysorbate vial patents from this case entirely, for the reasons articulated in the purchasers' MIL No. 10.[22] However, to the extent Sanofi is allowed to argue that the polysorbate vial patents asserted in the Hatch-Waxman litigation were an intervening and superseding cause, or that the purchasers bear the burden of establishing that those patents were improperly listed in the first place, evidence that those patents were invalid and improperly listed is highly relevant. The Court has recognized that a hypothetical lawsuit in which Sanofi asserted *only* the polysorbate vial patents would not be an intervening and superseding cause if, in response to such lawsuit, "the parties [would] have resolved the disputes more promptly, leading to a shorter delay or, in Merck's case, preventing abandonment of its follow-on product."[23] The undisputed evidence that those patents were invalid has a strong

[20] Doc. No. 300.

[21] Doc. No. 727 at 21–28 (Purchasers' Br., MIL Nos. 9 & 10).

[22] *Id*. at 25–28.

[23] Doc. No. 679 at 8–9 (SJ Order).

tendency to make it more probable that the parties may well have settled their cases earlier, as the Court described.[24]

Perplexingly, Sanofi claims that the purchasers may not "invoke causation" to discuss these issues, *i.e.*, that "such issues are not relevant . . . to the issue of causation, where the [polysorbate vial p]atents are relevant only as an independent regulatory bar."[25] But Sanofi cites no applicable authority for the proposition that causation is irrelevant to arguments about an "independent regulatory bar."[26] Indeed, the *Nexium* court found that the patent was an "independent regulatory bar," defeating causation, because the plaintiffs *failed* to raise validity and non-infringement arguments (despite the court's invitation to do so).[27] By contrast, the purchasers here seek to rebut Sanofi's causation defenses using the types of evidence that the *Nexium* court suggested.

***Serial petitioning.*** The purchasers do not intend to argue that Sanofi is liable under a *theory* of "serial petitioning" or to use the phrase "serial petitioning."[28] However, *evidence* of Sanofi's repeated Hatch-Waxman enforcement actions against its competitors is at the core of the purchasers' liability theory. Again, the purchasers' claim rests on allegations that Sanofi improperly listed the pen patents and then asserted those patents against its competitors.

---

[24] *Id.* The fact that the Patent Trial and Appeal Board concluded that the polysorbate vial patents were invalid as obvious is undisputed: *See* Doc. No. 657 at 4–5 n.10 (R&R); Doc. No. 629 at 3 n.4 (Sanofi's SJ Reply) (disputing the relevance, but not the fact, of the polysorbate vial patents' invalidity). Although Sanofi argues the timing of the PTAB's proceedings makes them irrelevant, the PTAB's ultimate conclusion is probative of the polysorbate vial patents' underlying merits at the time of the litigation.

[25] Doc. No. 724 at 6–7 (Sanofi's Br.).

[26] *See id.* Sanofi appears to cite *Nexium* for this proposition. But that case provides no support for Sanofi's position.

[27] *See In re Nexium (Esomeprazole) Antitrust Litig.*, 842 F.3d 34, 63–64 (1st Cir. 2016).

[28] *Contra* Doc. No. 724 at 6–7 (Sanofi's Br.).

Evidence of the merits and subjective motivation of these lawsuits is relevant, independent of any hypothetical "serial petitioning" claim, for the reasons stated above.[29]

***Product hopping.*** The purchasers do not intend to argue that Sanofi violated the antitrust laws by "product hopping," *e.g.*, that Sanofi delayed follow-on competition by coercively switching the market from Lantus SoloStar (the original insulin glargine pen) to the later-developed Toujeo (a tweaked insulin glargine pen).[30] Indeed, the purchasers have never asserted such a theory. But evidence about other Sanofi insulin products, such as Toujeo and Apidra, is essential. Toujeo is part of the relevant antitrust market and factors significantly into the parties' market power analysis.[31] Many of the same pen patents were listed for Apidra (although the Orange Book is organized differently for that product).[32] And Sanofi itself put Toujeo and Apidra at issue in this case by proposing trial exhibits referring to them.[33] The purchasers should not be precluded from answering Sanofi's attacks on market power by providing evidence of Sanofi's efforts to drive the sales of Toujeo and Apidra.

***Unasserted patents, including the polysorbate vial patents.*** Sanofi argues that any evidence "about whether Sanofi properly submitted [the polysorbate vial p]atents for listing in the Orange Book or about whether [those p]atents should have issued in the first place" is

---

[29] *See supra* at 5–7.

[30] *Contra* Doc. No. 724 at 7 (Sanofi's Br.). That said, the term "product hop" describes a common lifecycle management strategy in the pharmaceutical industry which, as Sanofi notes, is not necessarily illegal. *Id*. (noting that "soft switch" product hops are not necessarily unlawful).

[31] *See generally* Doc. No. 728-27 (Expert Report of Thomas G. McGuire, Purchasers' MIL Ex. 27); Doc. No. 728-3 (Expert Report of Dr. Laila Haider, Purchasers' MIL Ex. 3). Factually, sales of Lantus SoloStar declined before follow-on competition (Basaglar entry) due to Toujeo uptake. *See* Doc. No. 728-27 at Figure 4 (McGuire Rpt.). Apidra is similarly referenced in the parties' expert reports on market power.

[32] Ex. 12, Excerpt of Orange Book (36th Ed.).

[33] *See* Doc. No. 727 at 34 (Purchasers' Br.).

irrelevant.[34] Such evidence would be relevant to a theory of liability premised on polysorbate vial patents, which the purchasers do not advance. But it also directly and compellingly rebuts one of Sanofi's affirmative defenses; and, to the extent Sanofi is permitted to pursue this avenue, the purchasers should be allowed to meet it.

If Sanofi presents its polysorbate vial patent defense, the purchasers will introduce evidence and argument that the patents were not an intervening and superseding cause because (i) Lilly and Merck did not need to certify to those patents and (ii) the patents were improperly submitted for listing under 21 C.F.R. § 314.53.[35] Evidence that supports these positions is highly probative of the patents' ability to independently cause all of the purchasers' injuries for the reasons articulated in support of the purchasers' MIL No. 10.[36] Sanofi's claim that such evidence is irrelevant rests on the same faulty "independent regulatory bar" argument addressed above,[37] and fails for the same reasons.

Next, Sanofi argues that the purchasers cannot mention the pen patents it "never asserted against Lilly or Merck" or that were "not listed in the Orange Book until after Lilly and Merck submitted their follow-on applications."[38] Sanofi either misunderstands the basic improper listing claim or misrepresents it. The purchasers have always asserted that Sanofi is liable for improperly listing *all* of the pen patents.[39] And the mere listing of the pen patents is

---

[34] Doc. No. 724 at 7 (Sanofi's Br.).

[35] Doc. No. 727 at 25–27 (Purchasers' Br., MIL. No. 10).

[36] *Id.*

[37] Doc. No. 724 at 7 (Sanofi's Br.).

[38] *Id.* at 7–8.

[39] *See, e.g.*, Doc. No. 300 at 1 n.1 (Joint Stipulated Order in Limine) (alleging pen patents, including "unasserted" patents, were improperly listed); *see also* Doc. No. 657 at 6 nn.17 & 12 (SJ R&R) (finding that all pen patents improperly listed).

anticompetitive conduct.[40] Listing forces potential competitors to certify to those patents and, in this case, equipped Sanofi with the ability to trigger regulatory stays of approval.[41] That is true even of patents listed after a follow-on application is submitted. For example, the purchasers can demonstrate that Merck amended its insulin glargine NDA and submitted additional paragraph IV certifications in response to Sanofi listing the ’844, ’105, and ’008 pen patents in the Orange Book.[42] Sanofi then amended its complaint against Merck to include those patents, further complicating (and potentially prolonging) the litigation.[43]

***Other products.*** Sanofi argues that reference to any products other than Lantus SoloStar, Lilly’s Basaglar Kwikpen, or Merck’s Lusduna is irrelevant to the purchasers’ claim.[44] Not so. Sanofi’s Toujeo and Apidra are relevant for the reasons identified above.[45] As to Semglee, Mylan’s insulin glargine pen that launched after purchasers’ damage period, it is true that the purchasers are not arguing that Semglee should have launched earlier than it did. But Semglee (i) factors into the purchasers’ market power analysis,[46] (ii) figures in the discussion by the purchasers’ causation expert, Todd Clark, of why his opinion on competitive entry is

---

[40] *See* Doc. No. 657 at 3 (SJ R&R) (“Listing a patent in the Orange Book carries significant competitive consequences.”). Note that, here, while asserting the pen patents is necessary to establish damages under the Clayton Act § 4, Sherman Act § 2 is violated by the improper listing itself.

[41] *See Lantus*, 950 F.3d at 3 (“The listing of a patent in the Orange Book arms the patent-owning drug manufacturer with the ability to trigger an automatic, thirty-month suspension of the FDA's approval of a competitive product.”).

[42] Doc. No. 466 ¶¶ 430, 433, 436–37 (Am. Compl.).

[43] *Id.* ¶¶ 435 & 438; *see also* Doc. No. 679 at 8–9 (SJ Order) (articulating why the complexity of the Hatch-Waxman litigation is relevant to causation).

[44] Doc. No. 724 at 8 (Sanofi’s Br.).

[45] *See supra* at 8.

[46] Doc. No. 728-27 (McGuire Report, Purchasers’ MIL Ex. 27) at *passim.*

conservative—*i.e.*, there was evidence that Mylan would have launched Semglee earlier but for Sanofi's anticompetitive conduct but Mr. Clark does not include that in his analysis or offer an opinion on it,[47] and (iii) supports the purchasers' damages model because Semglee, the second follow-on to launch, did so at a lower price point than both Lantus Solostar and Basaglar Kwikpen.[48] And to the extent that Sanofi argues that its pen or polysorbate vial patents were a litigation threat outside of the Hatch-Waxman Act or had preclusive effect, Mylan is relevant because it sued Sanofi for improperly listing patents in the Orange Book and engaging in sham litigation.[49] Mylan's antitrust claims survived a motion to dismiss, undercutting the patents' supposed preclusive effect.[50]

***Scheme.*** Finally, Sanofi argues that the purchasers "can no longer claim any [overarching anticompetitive] scheme exists, since none of the other constituent parts on which the 'scheme' theory relied are still part of the litigation."[51] Sanofi misunderstands the purchasers' scheme allegations. Both "constitutent parts" of the purchasers' alleged scheme, (i) improper listing and (ii) assertion of the pen patents through litigation, are still very much part of this litigation.[52] Thus, references to Sanofi's alleged scheme are relevant. And, in any event, the word "scheme"

[47] Doc. No. 591-5 at 8, 61–62, 69 (Expert Report of Todd Clark).

[48] Ex. 10, Expert Report of Rena Conti (May 15, 2025), at Figure 2. The purchasers must also be allowed to reference Semglee to rebut Sanofi's attacks on their damages model. Ex. 11, Reply Report of Rena Conti (July 2, 2025) ⁋ 17.

[49] Complaint, *Mylan Pharmaceuticals Inc. v. Sanofi-Aventis U.S. LLC*, No. 2:23-cv-00836-MRH (May 17, 2023) (W.D. Pa.), ECF No. 1.

[50] Order, *Mylan Pharmaceuticals Inc. v. Sanofi-Aventis U.S. LLC*, No. 2:23-cv-00836-MRH (Jan. 27, 2026) (W.D. Pa.), ECF No. 85.

[51] Doc. No. 724 at 8–9 (Sanofi's Br.).

[52] *Id*. at 8; *supra* at 3–4.

has a plain, non-nefarious meaning, and it may well slip out when simply describing Sanofi's conduct.

**2. The evidence and argument Sanofi identifies is not unfairly prejudicial.**

Sanofi argues that, even if the evidence it targets is relevant, the Court should exclude it under Rule 403. But Sanofi does not identify any specific items of evidence or argument as unfairly prejudicial; instead, it directs its arguments to what it describes as "alternative liability theories" generally. Those generalized arguments leave the Court unable to make the "fact-intensive, context-specific inquiry" applying Rule 403 requires.[53] The Court should reject Sanofi's "unfair prejudice" for that reason alone. Regardless, Sanofi's generalized arguments fall flat. The above-described evidence would not deprive Sanofi of fair notice, cause confusion, or create any substantial inefficiency. Even if the Court found some danger of such prejudice, any minimal risk of unfair prejudice does not "significantly outweigh" the evidence's substantial probative value.

***Fair Notice.*** Sanofi has not, and cannot, identify any specific issues on which it was denied "the benefit of discovery or advanced briefing."[54] For example, Sanofi, not the purchasers, has put the polysorbate vial patents at issue. Sanofi cannot be subject to "trial by ambush" on an issue it introduced.[55] Even if that were not the case, issues related to the

---

[53] *Sprint/United Mgmt. Co. v. Mendelsohn*, 552 U.S. 379, 388 (2008); *see also United States v. Williams*, 717 F.3d 35, 41 (1st Cir. 2013) ("The delicate balance between probative value and prejudicial effect is fact-specific . . . .").

[54] *Contra* Doc. No. 724 at 10 (Sanofi's Br.).

[55] *Contra* Doc. No. 724 at 10 (Sanofi's Br.) (quoting *Rodriguez v. Doral Mortg. Corp.*, 57 F.3d 1168, 1172 (1st Cir. 1995) (citation modified)).

polysorbate vial patents have been extensively briefed.[56] Meanwhile, it was Sanofi that sought to limit discovery on issues related to the pen patents' validity and non-infringement.[57] Sanofi cannot now argue that it has been prejudiced by a lack of discovery it opposed. Sanofi is not unfairly prejudiced by any lack of fair notice.

***Confusion.*** The purchasers' evidence on these issues poses no serious risk of confusion. Unlike Sanofi's cited cases, the purchasers do not intend to introduce evidence of unpleaded or dismissed theories.[58] The purchasers will only put forward evidence that directly furthers their own theory of liability or rebuts Sanofi's defenses. Thus, *Epipen* is inapposite.[59] The purchasers' evidence here is more probative and poses little risk of confusion. For example, the purchasers would only introduce evidence of the pen or polysorbate vial patents' invalidity to rebut Sanofi's causation defense. And, unlike the unanswered question in *Epipen*, courts have already ruled that all of the polysorbate vial patent claims and many pen patents claims are invalid.[60] Any potential

---

[56] The parties have briefed the polysorbate vial patent issues in submissions on Sanofi's emergency motion to strike the purchasers' rebuttal expert reports (Doc Nos. 536, 542, 544), Daubert motions (Doc Nos. 569, 575, 605, 608, 621, 623), summary judgment (Doc Nos. 572, 609, 622), objections to the report and recommendation (Doc Nos. 672–73, 677–78), jury instructions (Doc Nos. 705–06), and now motions *in limine* (Doc Nos. 724 & 727).

[57] Doc. No. 727 at 21–22 (Purchasers' Br.) (citing Doc. No. 578 ¶ 9 (Decl. of T. Scheetz)) (explaining the discovery history on this issue).

[58] *Contra* Doc. No. 724 at 10–11 (Sanofi's Br.).

[59] *In re Epipen (Epinephrine Injection, USP) Marketing, Sales Practices & Antitrust Litig.*, 2021 WL 6072512, at *4 (D. Kan. Dec. 23, 2021). There, the court excluded evidence of a past settlement agreement that the proponent claimed was anticompetitive as evidence of a "prior bad act" to prove, *inter alia*, the defendant's motive in the current reverse-payment case. But because no court ever found the settlement unlawful, the jury would need to decide whether the settlement was in fact a "prior bad act"—which, in turn, would require the jury to evaluate over a decade's worth of past litigation disputes. And there, the defendant had not, *e.g.*, tried to defend itself by pointing to the prior settlement as the true cause of the purchasers' injuries.

[60] *Sanofi-Aventis Deutschland GMBH v. Mylan Pharms. Inc.,* 791 F. App'x 916 (Fed. Cir. 2019) (all polysorbate vial patent claims unpatentable); *Sanofi-Aventis Deutschland GmbH v. Mylan Pharms. Inc.*, 2021 WL 6137374 (Fed. Cir. Dec. 29, 2021) and *Sanofi-Aventis*

confusion that might flow from argument involving the polysorbate vial patents could be avoided by precluding Sanofi from raising them as a defense in the first place.[61]

***Inefficiency.*** Sanofi's claim that the purchasers will waste judicial time and resources on unnecessary issues is misplaced. Much of the evidence Sanofi complains of is necessitated by the defenses it raises. To the extent the Court wishes to avoid any "mini-trials" that may result from entertaining Sanofi's patent-related defenses, the Court may do so by granting the purchasers' MIL Nos. 9–10.

The Court should deny Sanofi's motion or reserve consideration until trial.

### B. Opposition to Sanofi's MIL No. 2: To Preclude Evidence of, Reference to, or Argument Regarding Post-Listing Legal Developments

The Court should deny Sanofi's motion for a categorical bar on what it calls "post-listing legal developments." Sanofi asks the Court to exclude "any evidence of, reference to, or argument about judicial opinions or regulatory actions" concerning patent listing criteria that post-date January 12, 2016.[62] Its theory is that the regulatory compliance defense depends "solely on the information available to Sanofi at the time it listed the Pen Patents," so anything later is irrelevant and prejudicial.[63] Sanofi draws no distinction between evidence for the Court and for the jury, nor between what bears on the objective versus subjective prong of Sanofi's defense, nor between affirmative use and cross-examination or rebuttal. Those distinctions matter.

---

*Deutschland GmbH v. Mylan Pharms. Inc.,* 2021 WL 6137375 (Fed. Cir. Dec. 29, 2021) (several pen patent claims unpatentable).

[61] *See* Doc. No. 727 at 25–28 (Purchasers' Br., MIL No. 10).

[62] Doc. No. 724 at 13–14, 17 n.3 (Sanofi's Br.).

[63] *Id.* at 14–17.

*Objective reasonableness.* It is for the Court to decide whether there is an objectively reasonable basis in regulatory policy to conclude that the listing statute and FDA's regulations required Sanofi to list the pen patents that did not refer to insulin glargine.[64] In doing so, it may consider how other courts and regulators have interpreted the very same listing requirements. The First Circuit's statement that "[w]e see nothing in the statute or regulations that welcomes such a further expansion of the already stretched statutory terms, whereby an integral part of an injector pen becomes the pen itself, and in turn is a drug" undercuts Sanofi's professed reasonableness in concluding the opposite.[65] So does the Federal Circuit's observation that "both the relevant statutory provisions and our case law clearly establish that what a patent claims and what infringes a claim are distinct concepts."[66] So, too, does the Federal Trade Commission's ("FTC") drumbeat that "device patents that do not mention any drug in their claims do not meet the statutory criteria for Orange Book listing."[67] All construe the same statute and regulations. All reach the same fundamental conclusion. They are no less persuasive on this issue for having been reduced to writing *after* Sanofi improperly listed the pen patents.

*Subjective good faith.* It is for the jury to decide whether Sanofi listed pen patents because it subjectively and in good faith believed that doing so was required by law.[68] In analyzing that issue, the admissibility of post-listing judicial opinions and regulators' actions

---

[64] Doc. No. 657 at 16–17 (R&R).

[65] *Lantus*, 950 F.3d at 8.

[66] *Teva Branded Pharm. Prods. R&D, Inc. v. Amneal Pharms. of N.Y., LLC*, 124 F.4th 898, 914 (Fed. Cir. 2024).

[67] Doc. No. 728-9 at 2 (Purchasers' MIL Ex. 9, FTC Amicus Br., *Teva Branded Pharm. Prods. R&D, Inc. v. Amneal Pharms. of N.Y., LLC*, No. 2:23-cv-20964, ECF No. 61-1 (D.N.J. Mar. 22, 2024)).

[68] Doc. No. 657 at 14 (R&R). The jury may also decide subsidiary factual disputes on which the Court's ruling may depend. *Id.* at 17.

should be assessed in light of the context in which they are offered. If Sanofi's expert opines that "FDA conceded the ambiguity in its Orange Book listing rules,"[69] evidence that the FDA supported the FTC's delisting efforts or that the Orange Book Transparency Act was intended to codify FDA's longstanding interpretation becomes relevant. If a Sanofi attorney fact witness testifies that the Federal Circuit's *Apotex v. Thompson* decision supports Sanofi's "claims means reads on" interpretation, the purchasers may cross-examine the witness with the Federal Circuit's statement in *Teva v. Amneal* that such a reading "both takes the quotation from *Apotex* out of context and misreads it."[70] And if Sanofi is permitted to present its industry practice evidence to the jury or argues that the FDA either tacitly approved of or tolerated listing device patents that do not claim a drug's active ingredient, the purchasers must be permitted to use the regulators' actual actions and statements to refute Sanofi's claim of regulatory legitimation. The motion should be denied.

**1. The "post-listing legal developments" show Sanofi's position to be objectively unreasonable and without any regulatory legitimation.**

***The First Circuit.*** The First Circuit held that "[u]nder the plain wording of the statute" the '864 patent "does not 'claim the drug'" and that "[t]he regulations clearly require a patent not to be submitted if it does not claim the drug."[71] The First Circuit then recognized a narrow defense for conduct "necessitated by concrete factual imperatives recognized as legitimate by the regulatory authority," available when the defendant "at the time had a reasonable basis in

[69] Doc. No. 728-4 ¶ 138 (Purchasers' MIL Ex. 4, Expert Report of Gregory J. Glover (May 31, 2024)).

[70] *Teva*, 124 F.4th at 915.

[71] *Lantus*, 950 F.3d at 8.

regulatory policy to conclude, and in good faith concluded," that the law required its conduct.[72] It also held that FDA's silence in response to industry requests for guidance proves nothing.[73] On remand, this Court entered judgment that all 19 pen patents were improperly listed.[74] And both parties have proposed to tell the jury that the Court determined the pen patents did not meet the listing criteria.[75]

***Teva v. Amneal.*** The Federal Circuit decided the same statutory question on materially identical facts. Teva listed in the Orange Book patents directed to components of its ProAir HFA inhaler device—not to its active ingredient, albuterol sulfate—and sued Amneal on those patents when Amneal filed an ANDA.[76] Amneal counterclaimed for an order delisting the patents. The district court granted it, holding that the patents "contain no claim for the active ingredient at issue, albuterol sulfate," but "are directed to components of a metered inhaler device."[77] The Federal Circuit affirmed. It began with the statute's history: the Orange Book Transparency Act of 2020 was enacted "to 'codify current [FDA] regulations and practice,'" under which, "since 2003," listable patents have been limited to "'drug substance (active ingredient) patents, drug product (formulation and composition) patents, and method-of-use patents.'"[78] The Federal

---

[72] *Id.* at 13 (quoting *Phonetele, Inc. v. AT&T Co.*, 664 F.2d 716, 738 (9th Cir. 1981) and *MCI Commc'ns Corp. v. AT&T Co.*, 708 F.2d 1081, 1138 (7th Cir. 1983)).

[73] *Id.* at 9–10.

[74] Doc. No. 657 at 11–12 (R&R); Doc. No. 679 at 2 n.4 (SJ Order).

[75] Doc. No. 704-1, D-57 (Joint & Disputed JIs) ("I have already determined that Sanofi incorrectly submitted the Pen Patents for listing in the Orange Book because the Pen Patents did not meet the statutory criteria for listing."); *id.* at P-57.

[76] *Teva*, 124 F.4th at 908–10; *Teva Branded Pharm. Prods. R&D, Inc. v. Amneal Pharms. of N.Y., LLC*, 2024 WL 2923018, at *5–7 (D.N.J. June 10, 2024).

[77] *Id.* at *6–7 (quoted in *Teva*, 124 F.4th at 910).

[78] *Teva*, 124 F.4th at 907 (quoting H.R. Rep. No. 116-47, at 6 (2019), and 21 C.F.R. § 314.53(b)(1)).

Circuit rejected Teva's argument that a patent "claims" the drug whenever the patent "reads on" the approved product.[79] It explained that it had "addressed and rejected" that infringement-based reading a quarter century earlier, and that *Apotex*—the case Sanofi relies on here—did not hold otherwise.[80] It rejected the argument that the approved product as a whole, inhaler and all, is "the drug" such that a patent on any component claims the drug product: a drug product is a finished dosage form "that contains a drug substance."[81] "On the facts of this case, the drug for which the application was submitted and approved is thus not every component of Teva's ProAir HFA. Instead, it is the part of the drug-device combination that made it registerable as a drug in the first place. And that is the active ingredient."[82] The Federal Circuit's analysis of the statutory text, the FDCA's overall scheme, and the regulations led it "to only one conclusion": "to claim that drug, the patent must claim at least the active ingredient."[83]

***The FTC's actions.*** The FTC has since policed improper device-patent listings with FDA's public support. In September 2023, the FTC issued a policy statement declaring that improperly listing patents in the Orange Book "may constitute an unfair method of competition," and cited this case as an example of an improper device-patent listing.[84] In November 2023 and again in April 2024, the FTC sent warning letters to manufacturers challenging more than 400

---

[79] *Id.* at 911.

[80] *Id.* at 914 (quoting *Hoechst-Roussel Pharms., Inc. v. Lehman*, 109 F.3d 756, 759 (Fed. Cir. 1997)); *see id.* at 914–15 (rejecting the reading of *Apotex, Inc. v. Thompson*, 347 F.3d 1335 (Fed. Cir. 2003) that Sanofi presses here, *see* Doc. No. 602 at 11–12 (Sanofi's Opp. to MPSJ)).

[81] *Id.* at 917.

[82] *Id.* at 921.

[83] *Id.* at 919.

[84] Doc. No. 728-1 at 4 & n. 31 (Purchasers' MIL Ex. 1, *FTC Statement Concerning Brand Drug Manufacturers' Improper Listing of Patents in the Orange Book* at 5 (Sept. 14, 2023)).

listings—among them Mylan's EpiPen patents and GSK's inhaler patents.[85] It told the district court and the Federal Circuit in *Teva v. Amneal* that "device patents that do not mention any drug in their claims do not meet the statutory criteria for Orange Book listing," and it told the court in *Mylan v. Sanofi*—a case about this very product—that "it is improper to list patents in the Orange Book that claim parts of a product other than the drug."[86] FDA's Commissioner publicly supported the FTC's effort.[87]

**2. The Court must consider the appellate decisions construing the listing statute, and the purchasers should be able to use them to confront witnesses who contradict them.**

Objective reasonableness is a question of law for the Court, and Sanofi has agreed that it "turns primarily on standard legal criteria such as the statutory text, the regulatory text, judicial precedent."[88] A legal question is answered against the correct reading of the statute. Sanofi's motion would have the Court answer it while ignoring the two appellate decisions—one of them

---

[85] Doc. No. 728-6 (Purchasers' MIL Ex. 6, Press Release, FTC Challenges More Than 100 Patents as Improperly Listed in the FDA's Orange Book (Nov. 7, 2023)); Doc. No. 728-7 (Purchasers' MIL Ex. 7, Press Release, FTC Expands Patent Listing Challenges, Targeting More Than 300 Junk Listings (Apr. 30, 2024)); Doc. No. 728-13 (Purchasers' MIL Ex. 13, Letter from R. Rao (FTC) to Mylan Specialty LP (Nov. 7, 2023)); Doc. No. 728-14 (Purchasers' MIL Ex. 14, Letter from R. Rao (FTC) to GSK (Nov. 7, 2023)); Doc. No. 728-15 (Purchasers' MIL Ex. 15, Letter from R. Rao (FTC) to GSK (May 2, 2024)); Doc. No. 728-8 ¶¶ 96–97, 99 (Purchasers' MIL Ex. 8, Expert Report of David A. Kessler (Aug. 9, 2024)).

[86] Doc. No. 728-9 at 2 (Purchasers' MIL Ex. 9, FTC Amicus Br., *Teva Branded Pharm. Prods. R&D, Inc. v. Amneal Pharms. of N.Y., LLC*, No. 2:23-cv-20964, ECF No. 61-1 (D.N.J. Mar. 22, 2024)); Doc. No. 728-10 at 21 (Purchasers' MIL Ex. 10, FTC Amicus Br., *Teva Branded Pharm. Prods. R&D, Inc. v. Amneal Pharms. of N.Y., LLC*, No. 24-1936 (Fed. Cir. Sept. 6, 2024)); Doc. No. 728-11 at 6 (Purchasers' MIL Ex. 11, FTC Amicus Br., *Mylan Pharms. Inc. v. Sanofi-Aventis U.S. LLC*, No. 23-cv-00836, ECF No. 61-3 (W.D. Pa. Nov. 20, 2023)); Doc. No. 728-8 ¶¶ 101–03 (Purchasers' MIL Ex. 8 (Kessler Report)).

[87] Doc. No. 728-12 (Purchasers' MIL Ex. 12, Press Release, FTC Issues Policy Statement on Brand Pharmaceutical Manufacturers' Improper Listing of Patents (Sept. 14, 2023)).

[88] Doc. No. 735 (Sep. 15, 2026 Hr'g Tr.) ("Hr'g Tr.") at 40:24–41:3; *see also id.* at 33:12–20 (the Court); Doc. No. 704-1, D-5 n.18 (Joint & Disputed JIs) (Sanofi acknowledging that "precedent" bears on "this Court's determination of objective reasonableness").

the law of this case—that supply that reading. Sanofi points to two sources for that result. The first is the First Circuit's observation that a statute "can be unambiguous once carefully construed, yet nevertheless be reasonably susceptible to mis-readings until that unambiguous reading is explained."[89] But the Circuit went on to say that "the fact that the law in this area is complicated does not by itself mean that Sanofi's action was reasonable," and it left Sanofi to prove a reasonable misreading with evidence of industry custom and practice and the legal advice Sanofi obtained.[90] A proof structure is not an exclusion order. Sanofi's second source is the "at the time" language in earlier cases articulating the regulatory compliance defense in the context of the Communications Act of 1934. Those cases point the other way.

*Phonetele* stated the defense in the words Sanofi quotes: if the defendant "at the time" had "a reasonable basis to conclude that its actions were necessitated by concrete factual imperatives recognized as legitimate by the regulatory authority," it did not violate the antitrust laws. The court explained what that inquiry involves: whether "the facts show the companies did reasonably conclude, given their expertise," that unrestricted interconnection would damage their equipment or disrupt their signals—matters that "must be developed at trial."[91] The court then drew an important line: "These factual justifications," it said, "are to be distinguished from the various legal issues in the case which we now foreclose. The defendants may not justify their actions based on some mistake of law in interpreting the [Federal Communications Act], or judicial or FCC decisions."[92] The "at the time" clause, in other words, modifies the facts the defendant reasonably perceived and the regulator's recognition of them. What the law required

[89] Doc. No. 724 at 15 (Sanofi's Br.) (quoting *Lantus*, 950 F.3d at 14).

[90] *Lantus*, 950 F.3d at 13–14.

[91] *Phonetele*, 664 F.2d at 737–38.

[92] *Id.* at 738.

was for the court—and the Ninth Circuit decided it, in 1981, for conduct that preceded its decision by years.

*MCI* shows how the two halves fit together at trial. MCI sued AT&T over AT&T's refusals to provide interconnections; AT&T defended on the ground that it believed in good faith that MCI was not authorized to offer the services and that FCC policy did not require the connections. After the refusals, the D.C. Circuit held in *Execunet* that MCI had been authorized all along. The district court instructed the jury on both points: that under *Execunet* MCI had been entitled to the interconnections as a matter of law, and that AT&T was not liable if it refused because it believed in good faith that regulatory policy justified the refusal, judged by "the historical context and all of the facts and circumstances known to the parties at the time."[93] AT&T appealed, arguing that the *Execunet* instruction was a retroactive application of new law that "placed AT&T in the anomalous position of being required to prove that it was ignorant of the law." The Seventh Circuit rejected AT&T's argument. The instruction "removed any misleading implication that MCI was not, as a matter of law, so authorized, leaving only the crucial question of AT&T's good faith belief." And the at-the-time instruction "preserved AT&T's good faith defense."[94] The jury in that case had been told what the law was, as later construed, and the Seventh Circuit found no error in it. This framework is the division of labor the purchasers propose: the appellate construction states the law; the good-faith instruction asks the jury whether Sanofi was actually trying to follow it.

*Southern Pacific* adopted the *MCI* formulation for the same reason, and its context confirms what the temporal element is for. The plaintiff's complaint on appeal was that the

---

[93] *MCI*, 708 F.2d at 1136–37 & n.80 (discussing *MCI Telecomms. Corp. v. FCC*, 561 F.2d 365 (D.C. Cir. 1977) (*Execunet*)).

[94] *Id.* at 1136–37.

district court had "upheld AT&T's after-the-fact rationalizations." The D.C. Circuit's answer was that the defense requires both a reasonable basis "recognized as legitimate by the appropriate regulatory agencies" and that the defendant "actually made its decision at the time in good faith."[95] The at-the-time requirement screens out reasons the defendant did not act on. That is the point the purchasers made at summary judgment: "[p]ost-hoc rationalizations are irrelevant" and later events "cannot justify" Sanofi's listings.[96]

The "at the time" language in these regulatory compliance cases does not support Sanofi's categorical bar. They do fix both elements of the defense to the moment of decision: the questions (i) whether at the time there was an objectively reasonable basis in regulatory policy to conclude the law required listing pen patents that did not identify the actual drug, and (ii) whether at the time Sanofi in fact believed that as the basis for its having listed them. Reasons discovered later do not count, and the jury must decide whether Sanofi actually acted on the reasons it now claims. But what the law objectively meant is not anchored to any moment: "A judicial construction of a statute is an authoritative statement of what the statute meant before as well as after the decision of the case giving rise to that construction."[97] That construction does not by itself decide whether Sanofi's reading was reasonable; *Lantus* leaves room for a reasonable misreading. It is, however, strong evidence of how much room the text ever left for

---

[95] *S. Pac. Commc'ns Co. v. AT&T Co.*, 740 F.2d 980, 1009–10 (D.C. Cir. 1984).

[96] Doc. No. 581 at 16. Sanofi quotes this passage and says "it follows" that later legal developments cannot undermine the defense either. Doc. No. 724 at 17 (Sanofi's Br.). It does not follow. The passage is headed "[p]ost-hoc rationalizations are irrelevant" and addresses later facts offered to supply a basis Sanofi did not have when it acted. The purchasers' brief invoked *Teva*, while acknowledging that it "did not exist between 2011 and 2018," because its rejection of Sanofi's interpretation "further confirms" that it was not objectively reasonable. Doc. No. 581 at 23 & n.111.

[97] *Rivers v. Roadway Express, Inc.*, 511 U.S. 298, 312–13 (1994); *see also Ortiz-Graulau v. U.S.*, 756 F.3d 12, 17 (1st Cir. 2014).

one. When two courts of appeals find the same, materially unchanged text "plain" and susceptible of "only one conclusion," that bears directly on whether a contrary reading in 2011 had a reasonable basis. And that is the kind of evidence courts may consult in asking whether a legal position was reasonable. For example, in deciding whether the government's position had "a reasonable basis both in law and fact," the Supreme Court explained that it is appropriate to look to how the position had fared in the courts, observing that "a string of losses can be indicative."[98] Sanofi's reading has lost in every court of appeals to consider it. The purchasers do not offer those losses to show what Sanofi knew. They offer them to show that Sanofi's interpretation of the law is not objectively reasonable.

Sanofi's analogies to other bodies of law do not help it. *Safeco* decided objective reasonableness as a question of law by construing the statute itself and found the defendant's reading reasonable because the text was "silent on the point."[99] Here, the First Circuit found this text "plain" and "clear." And *Safeco* held that where a reading is objectively reasonable, subjective bad faith is irrelevant—the very framework *Lantus* refused to adopt.[100] The qualified-immunity cases fare no better. Qualified immunity asks only whether the law was clearly established; it does not ask what the official actually believed or why—and *MCI* permitted the jury to be told how the law had later been authoritatively construed.[101]

The judicial opinions also must be available to confront any witness who tells the jury the statute means something else. The purchasers have moved to exclude the Glover, Williams, and

[98] *Pierce v. Underwood*, 487 U.S. 552, 565, 569 (1988).

[99] *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 69–70 (2007).

[100] *Id.* at 70 n.20; *see Lantus*, 950 F.3d at 13 (Sanofi "asks for immunity if its proffered reading of the statute was objectively reasonable. But the precedent we have cited requires that the challenged conduct be both reasonable and in good faith.").

[101] *MCI*, 708 F.2d at 1136–37.

Godici opinions on this subject because they are contrary to law.[102] The Court should grant that motion; an expert may not tell the jury that "claims" means "reads on" when two courts of appeals have held it does not. But if the Court permits any of that testimony, the purchasers must be able to test it. An expert may be cross-examined on the basis of his opinion,[103] and the basis of these opinions is a reading of the statute that the First and Federal Circuits have rejected. The jury cannot evaluate an expert's claim that the law was ambiguous, or that a device patent "claims the drug," without knowing that the courts charged with construing that law have held otherwise.

The same is true of Sanofi's fact witnesses. If a Sanofi witness testifies that they believed "claims the drug" means "reads on the product," or that an empty injector pen is a "drug," the purchasers may ask whether the witness now understands that numerous courts have held that reading wrong and why. That is not hindsight; it is impeachment, and it goes directly to the question the jury must decide. Sanofi's good-faith defense turns on whether Sanofi actually believed, when it acted, that the law required the listings. A witness who professes that belief puts its reasonableness in issue, because the less reasonable a professed reading of the law, and the less care that went into reaching it, the less likely it is that the reading was genuinely held. The Supreme Court recognized that dynamic in assessing a claimed good-faith misunderstanding of law: "the more unreasonable the asserted beliefs or misunderstandings are, the more likely the jury will consider them to be nothing more than simple disagreement with known legal duties."[104] And the First Circuit determined that "no close reader could have reasonably thought

---

[102] Doc. No. 727 at 42 (Purchasers' Br., MIL No. 20); Doc. No. 575 at 13–17 (Mem. ISO Purchasers' Mot. to Excl. Glover, Williams, and Godici); Doc. No. 679 at 2 (SJ Order).

[103] Fed. R. Evid. 705.

[104] *Cheek v. United States*, 498 U.S. 192, 203–04 (1991).

that submitting the '864 patent was so clearly proper as to obviate the need for inquiry and advice,"[105] which makes the care Sanofi took, and whether the advice it received was a plausible reading of the law, central to the good-faith inquiry.

**3. The Court must consider the FTC's actions and FDA's support, which are also admissible to test Sanofi's witnesses and to rebut its claim of regulatory legitimation.**

The FTC's actions and FDA's support bear on objective reasonableness for the same reason the appellate decisions do. The purchasers do not offer them to show what Sanofi knew in 2011. They offer them as evidence of how the agencies charged with administering and enforcing the listing statute have construed the same statute Sanofi claims to have been following—and that construction has been consistent throughout. In 2003, FDA considered comments urging that patents on devices "integral" to a drug product be listed and, as the First Circuit put it, "acknowledged those comments but did not adopt them," reiterating instead that the key factor is whether the patent claims the finished dosage form of the approved drug product.[106] In 2020, Congress codified FDA's "current" regulations and practice, under which, since 2003, listable patents have been limited to drug-substance, drug-product, and method-of-use patents.[107] And the FTC, with FDA's public support, has told the courts that device patents that do not mention any drug in their claims do not meet the statutory criteria for listing.[108] Later statements by the responsible agencies confirming a construction they have held all along are probative of whether a contrary reading was ever reasonable. Nothing in the at-the-time

---

[105] *Lantus*, 950 F.3d at 14.

[106] *Id.* at 8 (citing 68 Fed. Reg. at 36,680).

[107] *Teva*, 124 F.4th at 907 (quoting H.R. Rep. No. 116-47, at 6 (2019)).

[108] *See* supra n. 86.

requirement is to the contrary. That requirement screens out after-the-fact *reasons* for the defendant's conduct, not evidence of what the statute it was applying has always meant.

Sanofi's own record also forecloses any one-way rule. At summary judgment, Sanofi argued that FDA "to this day has never disagreed with, much less condemned" the listing of device patents; that "[a]s of the date of this filing" FDA had issued no guidance despite "inviting and receiving extensive public comments"; that "[e]arlier this year, Senator Bill Cassidy wrote to agency officials to lament their 'extraordinary abdication'"; and that "[a]s the FTC stated in court filings"—in September 2024—such listings were "widespread."[109] Dr. Glover devotes a section of his report to FDA's "Ongoing Consideration" of device-patent listings, marching through FDA, industry, and GAO activity from 2019 to 2023 to argue "continuing ambiguity."[110] The purchasers said in the *Daubert* briefing that any temporal line "should apply equally to both sides."[111] Sanofi's motion would draw the line for one side only: it could tell the jury that FDA never objected and that the FTC itself called the practice widespread, while the purchasers could not answer. Whatever the Court decides about post-2016 material, the rule must be the same for both parties.

The deeper point is that the FTC's actions with FDA's support go to the heart of the defense. The defense Sanofi asserts is not a general good-faith defense. It protects conduct "necessitated by concrete factual imperatives recognized as legitimate by the regulatory

---

[109] Doc. No. 572 at 7–8, 28 & n.8 (Sanofi's Mem. ISO MSJ) (citing Br. for FTC as Amicus Curiae, *Teva*, No. 24-1936 (Fed. Cir. Sept. 6, 2024), ECF 62, at 19); *see also* Doc. No. 602 at 16 & n.6 (Sanofi's Opp. to MPSJ) (same); Doc. No. 657 at 5 n.15 (R&R) (noting the 2024 Cassidy statement).

[110] Doc. No. 728-4 ¶¶ 121–37 (Purchasers' MIL Ex. 4 (Glover Rep.)); *see id.* ¶ 182 n.270 (relying on a 2022 FTC amicus brief).

[111] Doc. No. 608 at 20 n.86.

authority."[112] The question is whether the defendant "had a reasonable basis in regulatory policy" for what it did.[113] Everything in the defense, in other words, turns on showing that Sanofi's actions were mandated by the regulatory agency. That is why the Court asked at the hearing why industry practice would matter at all unless the evidence showed *the basis for why* the companies took those actions. Without such evidence, the actions may not show interpretations of the statute based on a regulatory imperative, but rather warped constructions motivated by anticompetitive purpose. (As a result, the purchasers have moved to exclude evidence of industry actions if that evidence does not show the basis for why the actions were undertaken.)[114]

Sanofi has made clear how it intends to prove regulatory legitimation: by suggesting that FDA sanctioned, or at least acquiesced in, the listing of device patents. Its briefs argue that FDA "has never disagreed with, much less condemned" the practice.[115] Its expert reads the 2003 preamble's reference to "pre-filled drug delivery systems" as FDA's confirmation that a patent on any part of an injector pen is listable, and Sanofi's 2011 listing opinion told it that "FDA has made clear that a patent need not claim the active ingredient . . . in order to qualify for listing."[116] The First Circuit has already held that the 2003 preamble says the opposite—that FDA "acknowledged" the proposal to list patents on "integral" devices "but did not adopt" it, and instead "reiterat[ed] that '[t]he key factor is whether the patent being submitted claims the

---

[112] *Lantus*, 950 F.3d at 13 (quoting *Phonetele*, 664 F.2d at 738).

[113] *Id.* (quoting *MCI*, 708 F.2d at 1138).

[114] Doc. No. 727 at 17–20 & n.72 (Purchasers' Br.); *see* Hr'g Tr. 34:10–36:2, 42:3–45:6.

[115] Doc. No. 572 at 7–8, 28 (Sanofi's Mem. ISO MSJ).

[116] Doc. No. 728-4 ¶¶ 99–101, 171 (Purchasers' MIL Ex. 4 (Glover Rep.)) (quoting 68 Fed. Reg. at 36,680); Doc. No. 572 at 28 (Sanofi's Mem. ISO MSJ) (quoting Sipes opinion that [redacted]

finished dosage form of the approved drug product'"—and that FDA's later silence "simply chose not to answer the question."[117]

If Sanofi nonetheless tells the jury that FDA countenanced device-patent listings—whether by characterizing the 2003 rulemaking as approval, by treating FDA's silence as assent, or by asserting that FDA has never objected—it opens the door to what the regulators actually said and did. A party whose presentation creates a misleading impression opens the door to the evidence that answers it. And the answer here is direct: the FTC has declared that improper Orange Book listings may constitute an unfair method of competition, citing *this case* as its example; it has challenged hundreds of device-patent listings, including patents on products in Dr. Glover's tally; it has told the courts in *Teva* and in *Mylan v. Sanofi* that such patents "do not meet the statutory criteria for Orange Book listing"; and FDA has publicly supported that effort.[118] A jury asked to decide whether FDA recognized Sanofi's conduct as legitimate is entitled to know that the agency has said the opposite.

Sanofi's industry-practice evidence should be excluded altogether; but if it comes in, the regulators' condemnation of that very practice should come with it. The purchasers have moved to exclude this evidence—the four advisory-opinion requests and the tallies of non-party listings—because a practice the regulators have condemned cannot evince a regulatory mandate, because the evidence shows that others listed but not *why*, and because the tallies are

---

[117] *Lantus*, 950 F.3d at 8 (quoting 68 Fed. Reg. at 36,680); *id.* at 9–10; *see* Doc. No. 727 at 19–20 & n.84.

[118] Doc. No. 728-1 at 6 & n.31 (Purchasers' MIL Ex. 1); Doc Nos. 728-6, 728-7, 728-9–15 (Purchasers' MIL Exs. 6, 7, 9–15); Doc. No. 728-8 ¶¶ 94–105, 125 (Purchasers' MIL Ex. 8 (Kessler Rep.)); Doc. No. 608 at 20 n.84 (Purchasers' Opp. to Mot. to Excl. Donatello, Kessler, and Schultz).

unreliable.[119] If that motion is granted, much of this dispute disappears. But if the tallies come in, the purchasers must be able to show what they are worth. Dr. Glover's Exhibit C counts, among others, GSK's inhaler listings and Mylan's EpiPen listings.[120] The FTC challenged those very listings; and FDA supported the challenges.[121] That evidence goes to the weight of the "practice" Sanofi invokes—to whether it reflected a shared understanding of what FDA required or a shared bet that FDA would not act. It is proper fodder for cross-examination of Dr. Glover, Dr. Williams, and any Sanofi fact witness who testifies about industry practice as well as proper rebuttal through Dr. Kessler.

**4. Rule 403 and Sanofi's cases do not support a categorical bar.**

Sanofi's Rule 403 cases involve other lawsuits. In *CPC International*, the excluded evidence was the outcome of two other contamination cases about other sites and other chemicals; the First Circuit affirmed because the probative value was "seemingly weak" and bolstering it would have meant "a replay of the litigation of those other two cases."[122] In *Maroney*, the court admitted a contemporaneous state-court ruling for its bearing on state of mind, with a limiting instruction, and excluded only the 2018 outcome of that case—brought against different defendants on different claims—because lay jurors "may have a hard time understanding what to make of a ruling by basically another sovereign."[123] Sanofi's out-of-

---

[119] Doc. No. 727 at 17–21 (Purchasers' Br., MIL No. 8).

[120] *Id.* at 20 & n.88; Doc. No. 728-4 at Ex. C (Purchasers' MIL Ex. 4 (Glover Rep.)).

[121] Doc. No. 728-4 ¶¶ 96–97, 99, 125 (Purchasers' MIL Ex. 8 (Kessler Rep.)); Doc Nos. 728-13–15 (Purchasers' MIL Exs. 13–15); Doc. No. 608 at 20 n.84 (Purchasers' Opp. to Mot. to Excl. Donatello, Kessler, and Schultz).

[122] *CPC Int'l, Inc. v. Northbrook Excess & Surplus Ins. Co.*, 144 F.3d 35, 44–45 (1st Cir. 1998).

[123] *Maroney v. Fiorentini*, 732 F. Supp. 3d 127, 156–59 (D. Mass. 2024).

circuit orders are of a piece.[124] Each of these cases excluded the outcome of some other proceeding. None of them excluded an appellate court's construction of the statute governing the case. The FTC materials, for their part, would come before the jury only in rebuttal to Sanofi's own evidence on issues Sanofi has chosen to try. The remaining concern—that jurors will judge Sanofi's 2011–2018 state of mind by 2020s law—can be addressed by a limiting instruction: later decisions and enforcement actions establish what the law is and what the regulators' position is; they are not evidence of what Sanofi knew.[125]

In sum, the motion should be denied. The Court should consider *Lantus* and *Teva* as well as the FTC's actions and FDA's support in deciding objective reasonableness. If any expert or fact witness is permitted to testify to an improper interpretation of the listing statute or regulation, the purchasers should be able to confront the witness with *Lantus* and *Teva*. And if Sanofi offers evidence or argument that FDA sanctioned or acquiesced in device-patent listings, is permitted to offer its purported industry-practice evidence, or offers testimony that the statute or regulations required the listings, the purchasers should be able to respond with the FTC's actions and FDA's support on cross-examination and in rebuttal.

---

[124] *See Helios Software, LLC v. Spectorsoft Corp.*, 2015 WL 3653098, at *1 (D. Del. May 22, 2015) excluded a different case against a different defendant about "different accused products." *Mass Engineered Design, Inc. v. SpaceCo Bus. Sols., Inc.*, 2017 WL 4334075, at *2 (D. Colo. May 2, 2017) denied a "broad and ill-defined" motion "[i]n all other respects" and barred only a fact-bound royalty ruling from a case against another defendant. *Roth v. Wiese*, 2005 WL 8175921, at *1–2 (D. Neb. Aug. 22, 2005) granted an unopposed motion to exclude the verdict and appeal status of a prior state-court case while admitting its filing as background. And *Implicit, LLC v. NetScout Sys., Inc.*, 2019 WL 6873030, at *4 (E.D. Tex. Nov. 21, 2019) excluded outcomes of the plaintiff's suits against other defendants and reexamination proceedings, while preserving prior-litigation evidence "for the purposes of impeachment or to show inconsistencies in opinions or positions."

[125] The Court has said it will explain matters to the jury as they arise. Hr'g Tr. 30:23–32:7. *Cf.* Doc. No. 727 at 21 (proposing a limiting instruction on industry-practice evidence).

### C. Opposition to Sanofi's MIL No. 3: To Preclude Evidence of, Reference to, or Argument Regarding Injury or Harm to Patients and Consumers

Sanofi seeks to preclude evidence of, reference to, and argument regarding injury or harm to patients or consumers, "whether in terms of the prices, insurance costs, or out-of-pocket expenses they allegedly might have paid, or any alleged physical injury, pain, or death they might have suffered as a result of Sanofi's challenged conduct."[126] Sanofi's motion is overbroad and should be denied.

First, the parties agree on several points. The purchasers will not misrepresent themselves to be consumers. Nor will they or Sanofi provide evidence that the purchasers "passed on" some overcharges to consumers.[127] The purchasers will not seek to send a message about the high cost of prescription drugs, or argue that jurors would benefit personally by giving a verdict for the purchasers.[128]

Second, and more to the point, "[t]he antitrust laws are intended to benefit consumers. In that sense, every antitrust case—including this one—is ultimately about consumer harm. Purchasers have a right to make general policy arguments about antitrust protections, and Defendants are not prejudiced by the simple fact of having to respond."[129] Further, the Hatch-Waxman Act, which is central to the allegations in this case, "was passed with the express purpose of expediting the entry of noninfringing generic competitors into pharmaceutical drug

---

[126] Doc. No. 724 at 28 (Sanofi's Br.).

[127] *Id*. at 29.

[128] *Id*. at 30.

[129] *In re Zetia (Ezetimibe) Antitrust Litig.*, 2023 WL 4156858, at *3 (E.D. Va. Apr. 5, 2023); *See also Monahan's Marine, Inc. v. Boston Whaler, Inc.*, 866 F.2d 525, 527 (1st Cir. 1989) ("[t]he Sherman Act's very purpose is to help consumers"); *Walker v. Analog Devices, Inc.*, 2023 WL 5353764, at *3 (D. Mass. Aug. 4, 2023), *report and recommendation adopted* (Aug. 18, 2023), *aff'd*, 2024 WL 4190856 (1st Cir. May 30, 2024) ("The purpose of the Sherman Act is to assure customers the benefits of price competition[.]").

markets in order to decrease healthcare costs for consumers."[130] At least three courts have recognized these truisms and denied similar motions to prevent references to consumer harm in cases involving direct purchaser plaintiffs.[131] In light of this legislation and case law, purchasers should be allowed to talk about the role of competition in reducing consumer-level drug prices.

Third, the purchasers may provide background evidence that would include information about consumer pricing. In addition to background evidence about the Hatch-Waxman Act, it is critical for the jury to learn (a) basic information about drug pricing, which is important context for purchasers' claims, and (b) the structure of the pharmaceutical industry, which is important for the jury to understand exactly who the purchasers are and how they fit into the broader health care ecosystem. Background evidence is relevant and "universally offered and admitted as an aid to understanding."[132] Courts have held that general information about consumer-level drug pricing, the structure of the pharmaceutical industry, and the purpose of the Hatch-Waxman Act is admissible as long as a party does not appeal to the jury's direct self-interest, disparage the pharmaceutical industry generally, or encourage the jury to disregard the law to enact specific

---

[130] *In re Nexium (Esomeprazole) Antitrust Litig.*, 968 F. Supp. 2d 367, 378 (D. Mass. 2013).

[131] *Zetia*, at *3 (denying portion of defendants' motion to preclude plaintiffs from asserting harm to consumers on the grounds that there was no consumer class in the case); *FWK Holdings LLC et al v. Takeda Pharmaceutical Company Ltd. et al.*, No. 21-cv-11057, Doc. No. 763 (D. Mass. Apr. 11, 2026) ("Plaintiffs concede that they will not characterize themselves as [consumers]. To the extent this motion also seeks to preclude any reference to harm or benefits to consumers where relevant, the motion is denied."); *In re HIV Antitrust Litig.*, 2023 WL 5670808, at *6 (plaintiffs precluded from "argu[ing] outright that individual consumers have been overcharged" but "not barred from arguing that competition is beneficial to consumers (e.g., it can affect price and/or quality of goods)."). *Cf. Deselms v. Occidental Petroleum Corp.*, 2024 WL 4103603, at *5 (D. Wyo. July 29, 2024) ("given the relevance that societal harm has in relation to the Sherman Act, the Court will not preclude Plaintiffs from introducing evidence, testimony, or argument that Defendants' alleged anticompetitive conduct harmed society or the community").

[132] Fed. R. Evid. 401 Advisory Committee Notes.

policy objectives.[133] Cases cited by Sanofi in fact allow testimony on those topics given appropriate limits.[134]

Other cases cited by Sanofi are distinguishable. The court in *Louisiana Wholesale Drug Co., Inc.* cited *Illinois Brick*[135] to preclude evidence of economic harm to consumers,[136] but the purchasers here do not intend to provide any quantification of how indirect purchasers were harmed, but instead to provide context for the purchasers' arguments about harm to direct purchasers and the Hatch-Waxman Act. The court in *King Drug* precluded "[w]ide ranging evidence and argument regarding policy issues," while the purchasers seek to provide basic context for their case against Sanofi, not broader policy arguments about generic and follow-on drugs generally.[137] In *North American Soccer League*, the plaintiff argued "that a court may properly consider downstream effects in determining whether a defendants' conduct had

---

[133] *See, e.g.*, *In re Namenda Direct Purchaser Antitrust Litig.*, 2019 WL 6242128, at *6 (S.D.N.Y. Aug. 2, 2019) (denying "motion to exclude evidence of general drug pricing trends in the pharmaceutical industry" because "this evidence will likely aid in the jury in understanding the context in which the case arises and is background information"); *In re Loestrin 24 Fe Antitrust Litig.*, 2019 WL 13257216, at *4 (D.R.I. Dec. 6, 2019) (holding that "[w]itnesses may discuss policies and issues regarding the structure of the pharmaceutical industry and the policy behind certain laws (e.g., the Hatch-Waxman Act or laws affording patent protection to inventors) in order to give context to the jury").

[134] *See In re Intuniv Antitrust Litig.*, 2021 WL 10362709, at *16 (D. Mass. Mar. 3, 2021) (permitting plaintiffs "to elicit proper testimony concerning how the pharmaceutical industry functions, including the differences in pricing between brand-name and generic drugs, subject to standard trial objections"); *In re Solodyn (Minocycline Hydrochloride) Antitrust Litig.*, No. 1:14-md-02503, Doc. No. 1089 (D. Mass. Mar. 8, 2018) (denying in part motions in limine "to exclude to evidence of rising costs of healthcare and pharmaceuticals, policy arguments regarding the pharmaceutical industry and/or appeals to jurors as consumers" on the basis that "some context is appropriate and that these topics in and of themselves are not unduly prejudicial").

[135] *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977).

[136] Doc. No. 726-1 at 4-5 (Suska Decl. Ex. 1).

[137] *King Drug Co. of Florence, Inc. v. Cephalon, Inc.*, 2016 WL 5929051, at *2 (E.D. Pa. Jan. 21, 2016).

anticompetitive effects in an upstream market," and the court rejected that argument.[138] The purchasers are not making this argument, but instead seek to provide the jury with context for the purchasers' actual arguments.

Fourth, Sanofi would not suffer unfair prejudice. While Sanofi cites *Intuniv*, *Solodyn*, and *Nexium* to claim this type of evidence is prejudicial,[139] the purchasers do not intend to give the types of testimony that those courts precluded, such as sending a message about the high cost of prescription drugs or appealing to the jurors' own interests as consumers. As shown above, the *Intuniv* and *Solodyn* courts did in fact provide support for background information as context, and the purchasers should be allowed to explain how competition reduces consumer-level drug prices.

Fifth, evidence of consumer effects will not confuse the jury.[140] The purchasers will make clear that they are direct purchasers of Lantus SoloStar and are drug wholesalers and distributors, and if the jury finds liability, damages are calculated from overcharges to direct purchasers. The jury instructions will make these same points. There is no reason to believe that information about consumer effects that is intended to provide context for purchasers' claims would confuse their evaluation of the core liability and damages questions in this case.

Finally, Sanofi suggests that evidence of consumer effects would be inefficient, since it would require Sanofi to introduce counter-evidence, and thereby waste time on a matter

---

[138] *N. Am. Soccer League LLC v. United States Soccer Fed'n, Inc.*, 2024 WL 2959967, at *16 (E.D.N.Y. June 12, 2024), *order corrected on reconsideration*, 2024 WL 7020163 (E.D.N.Y. July 18, 2024), and *aff'd*, 2026 WL 1397077 (2d Cir. May 19, 2026), and *aff'd*, 2026 WL 1397077 (2d Cir. May 19, 2026).

[139] Doc. No. 724 at 32–33 (Sanofi's Br.).

[140] *Id.* at 33–34.

collateral to the actual issues in the case.[141] As explained above, this is important background information and context for the purchasers' case, and if Sanofi disagrees with the purchasers' presentation of it, it can give its perspective on this background information. It will not engender a mini-trial on this matter.

### D. Opposition to Sanofi's MIL No. 4: To Preclude Evidence of, Reference to, or Argument Regarding Sanofi's "Lobbying" Activities Concerning State Pharmacy-Level Substitution

Sanofi seeks to exclude evidence of its efforts to persuade state legislatures to prevent pharmacy-level substitution of biosimilars for Lantus, arguing that such evidence has marginal relevance and any mention of lobbying "would create an overwhelming risk of unfair prejudice."[142] Sanofi omits context and miscasts the purchasers as intending to malign it. The purchasers seek only the opportunity to rebut Sanofi's arguments that its lobbying had no impact on competition.

Sanofi cites limited testimony from its Rule 30(b)(6) deponent, James Borneman, designated by the purchasers.[143] Mr. Borneman answered questions about a reference in an internal Sanofi forecast regarding its efforts to lobby state legislatures to reject or delay legislation that would provide for pharmacy-level substitution for biologics similar to the laws governing generic substitution. By referencing its lobbying activities in its own forecasts, Sanofi acknowledged its relevance. Sanofi should not be able to shield from the jury a topic that it found to be relevant when making decisions about potential competition.

---

[141] *Id*. at 34.

[142] Doc. No. 724 at 29 (Sanofi's Br.).

[143] Sanofi counter-designated a number of additional pages of Mr. Borneman's testimony on this issue.

As Sanofi recognized, its lobbying is relevant to market penetration. The degree to which follow-on biologics like Lilly's Basaglar were able to penetrate the market, *i.e.*, take sales from Lantus, is relevant to the issues of market power and damages. For market power, the sales Basaglar took from Lantus bears on cross-price elasticity and defining the relevant market. If Basaglar demonstrates cross-price elasticity with Lantus, it belongs in the relevant market. Also relevant is Basaglar's success in taking sales from Lantus compared to the relative failure of other drugs. Market penetration also matters for damages. The purchasers' damages expert modeled a world without Sanofi's anticompetitive behavior, accounting for events that actually happened, such as Basaglar's market penetration. But that penetration may have been impacted by Sanofi's efforts to prevent substitution. If Sanofi intends to argue—as it did in its expert reports—that Basaglar's limited market penetration, particularly shortly after launch, is evidence that the relevant market should be defined more broadly than the purchasers propose or that the purchasers' damages model is improper, it would be highly prejudicial to the *purchasers* to be precluded from presenting evidence that Sanofi was actively seeking to prevent market penetration.

The relevance of Sanofi's lobbying to market power and damages differs from the issue in *USFL v. NFL.*[144] There, the court first decided that USFL's efforts to petition state and local governments for stadium access were protected by the First Amendment and therefore not an exception to *Noerr-Pennington* and not an antitrust law violation.[145] The court then examined whether evidence of the petitions should be excluded altogether. While not reaching a decision, the court stated that "[t]he introduction of *Noerr-Pennington* evidence to illustrate the purpose or

[144] 634 F. Supp. 1155 (S.D.N.Y. 1986).

[145] *Id.* at 1178–79.

character of unprotected conduct" should be subject to analysis under Rule 403.[146] But that is not the purchasers' intent here. The purchasers do not argue that Sanofi's lobbying was improper, only that it bears on market power and damages. Additionally, if Sanofi argues at trial that it undertook efforts to ensure easy access to insulins or its actions were guided solely by concerns over patients' health and safety, the purchasers should be permitted to introduce evidence that it lobbied state legislatures to make follow-on insulins harder to access to protect Lantus revenues from competition.[147] Sanofi's motion should be denied or reserved for trial.

### E. Opposition to Sanofi's MIL No. 5: To Preclude the Use of Prejudicial Words

To partially resolve this motion, the purchasers will agree not to describe Sanofi as "greedy;" pharmaceutical companies as "too big," "big drug companies," or "big pharma;" Sanofi as a foreign or French company except to the extent those facts are in documents or deposition testimony admitted in evidence; or to use the phrase "send a message." However, the purchasers oppose this motion to the extent that it seeks to preclude them from using the terms "deception," "exploit," "take advantage of," "error," "mistake," "patent monopoly," "victims," "scheme," "cheating/gaming the system," "legal loophole," "sham," and referring to Sanofi as having made "false or misrepresentative attestestions or certifications in its 3542s," all of which are routinely permitted by courts.

"[L]itigants are generally afforded an opportunity to present their own theories of the case, including by choosing the language they use, and should not be prohibited from using terminology that opposing parties find unflattering."[148] None of Sanofi's cited cases supports its

---

[146] *Id.* at 1180.

[147] Doc. No. 726-2 (Borneman Tr. 50:05-07, 50:10-14, Sanofi MIL Ex. 2).

[148] *Intuniv*, 2021 WL 10362709, at *7.

requested broad prohibition of the remaining terms that it finds "prejudical."[149] While Sanofi cites *Intuniv*, it ignores the broader approach that court outlined and attempts to shoehorn terms Sanofi objects to as invoking ethics or morality.[150] Here, the purchasers' allegations involve acts that constitute "deception," "loopholes," "taking advantage of" listings," and "gaming the system."[151] Prohibition of their use would result in the outcome Judge Burrowes cautioned against, *i.e.*, prohibiting the purchasers from presenting "their own theories of the case." Notably, these terms and their synonyms have been used by the First Circuit and this Court.[152] Both courts have also described Sanofi's exclusivity from its Orange Book listing as a "monopoly" and used the term "scheme."[153] The Department of Justice uses "victims" to describe those harmed and/or "deceived" by anticompetitive acts and has referred to such acts as "schemes."[154] These terms

---

[149] Most of Sanofi's cases do not address use of pejorative words at all; *See Velez v. Marriott PR Mgmt.*, 590 F. Supp. 2d 235, 258 (D.P.R. 2008) (defining relevant evidence); *Williams v. Drake*, 146 F.3d 44, 48–49 (1st Cir. 1998), (affirming trial court's exclusion of evidence of guilty plea); *United States v. Burgess*, 576 F.3d 1078, 1099–101 (10th Cir. 2009) (affirming trial court's admission of pornographic photographs as impeachment evidence); *United States v. Amaya-Manzanares*, 377 F.3d 39, 45–46 (1st Cir. 2004) (reversing trial court's exclusion of evidence, *i.e.*, defendant's certificate of illegal entry and testimony). Two of Sanofi's citations concern use of "Big Pharma," a term no longer at issue; *see CureVac SE v. BioNTech SE*, No. 2:23-cv-00222, Doc. No. 794, at 2 (E.D. Va. Feb. 24, 2025) and *Zetia*, 2023 WL 4156858, at *3.

[150] Doc. No. 724 at 32 (Sanofi's Br.).

[151] *See also* Doc. No. 679 at 8 (SJ Order) (observing "Sanofi *took advantage* of [its improper pen patent listings].") (emphasis added).

[152] For example, both courts have used the term "scheme." *Lantus,* 950 F.3d at 6 (The purchasers "bring two claims under section 2 of the Sherman Act . . . based on an unlawful *scheme* to monopolize and an attempt to monopolize the market for insulin glargine products.") (emphasis added); *Lantus*, 512 F.Supp.3d *passim* (referring to alleged "scheme" throughout the opinion). *See also FWK Holdings LLC v. Takeda Pharm. Co.*, No. 1:21-cv-11057, ECF No. 763 (D. Mass. Apr. 11, 2026) (permitting use of "scheme").

[153] *Lantus*, 950 F.3d at 3, 6, 14; Doc. No. 679 at 2 n.4 (SJ Order).

[154] Antitrust Division, U.S. Dep't of Justice, Federal Antitrust Crime: A Primer for Law Enforcement Personnel, at 4–5, 7–10 (Oct. 2023), https://www.justice.gov/atr/page/file/1091651/dl (including Section II.E Victims and

are not inherently perjorative, derogatory or prejudicial whether used generally or in the context of this case.

The First Circuit's ruling demonstrates why the purchasers should be permitted to argue that Sanofi made false or misrepresentative attestations or certifications in its Form 3542s and referring to the listings as "mistakes," "errors," and similar terms. "We therefore hold that the facts and reasonable inferences found in the complaint *describe an improper submission of the '864 patent for listing in the Orange Book*; that the defenses to antitrust liability as a result of such *an improper submission* . . . ."[155] This Court has also referred to Sanofi's "improper" listings.[156] Accordingly, while the purchasers are not advancing the sham theory of liability, "sham" has an ordinary and plain meaning and is appropriate to describe Sanofi's conduct.[157] The First Circuit referred to Sanofi's "mistake."[158] While certain terms may be perjorative, "this is a function of the acts that the defendants engaged in, not the government's inaccurate

Restitution, describing "schemes" to allocate markets or monopolize markets, and using the words "sham" and "deceive"). *See also FWK Holdings LLC v. Takeda Pharm. Co.*, No. 1:21-cv-11057, ECF No. 763 (D. Mass. Apr. 11, 2026) (permitting use of "scheme"); *United States v. Glover*, 2025 WL 1580848, at *12–13 (S.D.N.Y. June 3, 2025) (denying defendant's motion *in limine* to preclude the government from using "illegal," "scheme," "sham," and references to "illegal conduct").

[155] *Lantus*, 950 F.3d at 14 (emphases added); *see also* Doc. No. 679 at 3 (SJ Order) ("The First Circuit [held] that Sanofi's interpretation of the governing law was wrong and that Sanofi's submission of a Pen Patent for Orange Book listing, as alleged in the complaint, was improper.").

[156] Doc. No. 679 at 2-3, 7-9 & n.4 (SJ Order).

[157] The Cambridge Dictionary defines "sham" as "something that is not what it seems to be and is intended to deceive people . . . ." *Sham*, Cambridge Dictionary, https://dictionary.cambridge.org/us/dictionary/english/sham (last visited Sept. 30, 2026).

[158] *Lantus*, 950 F.3d at 10 (explaining that Sanofi offers a "reasonable mistake" defense to improper pen patent listing).

description of those acts."[159] The purchasers should be permitted to use the same or similar terms as the courts have in this case.

**F. Opposition to Sanofi's MIL No. 6: To Preclude Any Negative or Adverse Inference Based on Sanofi's Invocation of Privilege**

Sanofi's motion conflates two distinct concepts: disparaging the attorney-client privilege, and accurately informing the jury about Sanofi's limited and partial privilege waiver and how it affects the trial evidence. No one advocates the former,[160] and the latter is critical.

Sanofi's motion confirms, just as the purchasers presaged,[161] that Sanofi intends to impermissibly use privilege as both a sword and a shield at trial. The "sword" is Sanofi's use of documents it believes will be helpful in trying to convince a jury that its listing decisions were supported by "counsel's opinions regarding listing patents for Lantus and Lantus SoloStar in the Orange Book," and its selective use of "*certain* other documents from counsel in Hatch-Waxman enforcement litigation[.]"[162] The "shield" is Sanofi's use of privilege to block discovery into, or presentation of evidence regarding, *other* advice Sanofi received bearing on the same issues, such as the balance of "documents from counsel in Hatch-Waxman enforcement litigation,"[163] and other advice regarding the listing requirements that Sanofi received, but as to which it asserted privilege. Thus, at trial, the Court will need to draw sharp lines, lest the purchasers be constrained to seek, and the Court compelled to order, production of previously withheld documents in the midst of trial. No one wants a repeat of *Nexium*, where an attorney waived

[159] *United States v. Felton*, 417 F.3d 97, 103 (1st Cir. 2005).

[160] Quite the opposite: *the purchasers* proposed instructing the jury that they may not draw "an adverse inference" based on privilege. *See* Doc No. 705 at 4–5 (P-18) (Sanofi's Proposed JI).

[161] *E.g.*, Doc. No. 724 at 33–35 (Sanofi's Br.).

[162] *Id*. at 33 (emphasis added).

[163] *Id.*

privilege on the stand, Judge Young compelled the production of several previously withheld documents mid-trial,[164] and attorney witnesses had to be recalled so that they could be cross-examined about how one of the produced documents contradicted their earlier testimony.

As to Sanofi's motion: Sanofi would have the Court tell the jury that it "waived the attorney-client privilege over legal advice regarding the patent listing requirement of the Hatch-Waxman Act," broadly suggesting Sanofi waived privilege as to *all* advice it received regarding Orange Book listing requirements.[165] But Sanofi's *actual* waiver was far narrower: as Sanofi finally acknowledges, it was both "partial[]" and "limited[.]"[166] Sanofi largely blocked discovery into, *inter alia*, any legal advice it sought or received regarding the listing requirements *generally*—*i.e.*, advice that would inform an understanding of the listing requirements as a general matter—*unless* that advice was specifically tied to one of the patents Sanofi listed for Lantus or Lantus SoloStar (or, for one outside counsel, advice regarding listing patents for "[redacted]" which he says he never gave).[167] Yet, Sanofi wants the jury to answer questions that turn on allegedly privileged evidence—*e.g.*, to draw conclusions based on *all* the legal advice Sanofi "received"[168]—even though the jury will only see or hear the partial, limited subset of evidence that Sanofi has *disclosed* through its partial waiver of privilege.

---

[164] Ex. 9 to Declaration of W. Henry Huttinger, *In re Nexium*, D. Mass. Case No. 12-md-2409, Doc No. 1413 (Nov. 10, 2014 Hr'g Tr.) at 10–11.

[165] Doc. No. 704-1 at 43; Doc. No. 727 at 35.

[166] Doc. No. 724 at 33, 36.

[167] *See* Huttinger Decl. Ex. 1, Declaration of Trevor K. Scheetz, submitted herewith.

[168] Doc. No. 704-3 at 3, Question 8 (Sanofi's Proposed Verdict Form).

Sanofi's present motion tries to bar the jury from learning the truth: Sanofi's privilege waiver was, just as Sanofi now describes it (and contrary to its proposed instruction), partial and limited. But courts in analogous circumstances—where an incomplete waiver of privilege results in presentation of some, but not all, relevant evidence at trial—have held there is no reason to hide this truth from the jury, and that doing so would unfairly prejudice the purchasers.[169] Where only a partial presentation of allegedly privileged evidence will be made at trial, these courts readily distinguish between drawing an adverse inference, which is not allowed, and allowing comment on the *absence* of evidence that results from invocation of the privilege, which is "require[d] . . . for fairness purposes."[170] The Court should not give Sanofi's misleading waiver description, nor bar the purchasers from asking the jury to weigh evidence it *will* hear against evidence it *will not* hear because of Sanofi's admittedly partial and limited waiver of privilege.

Sanofi's motion is also premature. The Court should, at an appropriate time, decide whether and how the jury will be instructed regarding privilege and its waiver, and what questions will be asked of the jury that turn in on evidence as to which privilege was (partially) waived.[171] If and when evidence subject to the waiver is presented at trial, the Court can

---

[169] *See*, *e.g.*, *HIV*, 2023 WL 5670808, at *6 (Chen, J.) (where only one of two defendants waived privilege, resulting in partial presentation of "evidence of . . . subjective beliefs" at trial, "it is fair for Plaintiffs to be able to comment" about evidence that will not be produced because the defendant "did not waive its attorney-client privilege"); Huttinger Decl. Ex. 8, *In re Glumetza Antitrust Litig.*, N.D. Cal. No. 3:19-cv-5822-WHA, Doc No. 653 (Tr.) at 48-51 (Sept. 8, 2021) (Alsup, J.) ("it is unfair for the defendants" to make arguments relying on evidence produced via incomplete privilege waiver "and prevent the jury from knowing or the plaintiffs from pointing out to the jury that the jury has not been shown" other evidence as to which privilege was maintained, and "the absence of evidence" resulting from partial disclosure "can be weighed by the jury"); *see also Zetia*, E.D. Va. Case No. 2:18-md-2836, Doc. No. 2099 at PageID# 59793-94, 59800, 59913-14 (Apr. 14, 2023, Hr'g Tr.) (explaining it may be necessary to explain to jurors how invocation of privilege impacts evidence presented at trial).

[170] Huttinger Decl. Ex. 8, *In re Glumetza*, *supra*, at 50 ("Otherwise, it's too misleading.").

[171] Doc. No. 704-1 at 43 (Parties Joint & Disputed JI); Doc. No. 727 at 35 (Purchasers' Br.).

determine—with the benefit of context—whether more should be said about how Sanofi's narrow waiver affects the evidence the jury will see and hear. Accordingly, while neither side should disparage the attorney-client privilege or seek an adverse inference from its invocation, Sanofi's motion should be denied or, in the alternative, deferred.

Should the Court address this issue now, the purchasers offer three further observations.

*First*, Sanofi's request is impossibly vague. If a Sanofi in-house attorney testifies he received legal advice supporting a listing decision, is it "negative" to ask on cross whether he received *other* advice from *other* attorneys—and what it was—simply because Sanofi believes the answer falls outside its "partial[]" waiver?[172] If Sanofi's outside counsel testifies he advised Sanofi it need not tell FDA that patents were listed incorrectly for Lantus and Lantus SoloStar, is it "adverse" to ask whether he gave Sanofi *other* advice regarding those Orange Book-listed patents, just because Sanofi believes its "limited" waiver does not reach the answer?[173] The jury must understand there is evidence they *will not* hear because of how Sanofi drew its waiver—not to malign Sanofi, but to allow the jury fairly evaluate the evidence that *will* be presented at trial.

---

[172] For example, John Conway, Sanofi's then Global Head of Intellectual Property, who is expected to testify live at trial, testified that [redacted]. (Doc. No. 579–87, Conway Tr. at 102–03).

[173] Sanofi initially refused to permit its outside counsel, David Fox, to even say [redacted]. Fox then testified that he [redacted]. (Huttinger Decl. Ex. 7, Fox Tr. at 72–77, 90–95, 99–103, 123–31).

*Second*, any privilege-related problem is of Sanofi's own making. The law has long been clear that a party cannot "testify to its subjective beliefs," which "attorney-client advice [at least allegedly] played a significant role in formulating," and then block "disclosure of the otherwise privileged material" needed "to test the credibility of those subjective beliefs."[174] Yet, Sanofi injected legal advice into this case—by *partially* waiving privilege and asserting a regulatory compliance defense—then decided along the way where it would produce evidence or allow certain testimony, and where it would block other relevant inquiries by asserting privilege.[175] Those strategic decisions may very well hamper Sanofi's ability to prove its regulatory compliance defense.[176] But that does not entitle Sanofi to a misleading jury instruction, nor to a gag order preventing the jury from understanding that Sanofi *did not* produce all legal advice bearing on its claimed good faith. Just as a party may not "us[e] the attorney-client privilege as both a sword and a shield,"[177] Sanofi cannot ask jurors to credit selectively disclosed advice while concealing the boundaries of the disclosure.

*Third*, Sanofi's authorities do not support its overbroad request. Sanofi's cases establish only that a factfinder may not draw an adverse inference from a party's proper assertion of

---

[174] *In re Lidoderm Antitrust Litig.*, 2016 WL 4191612, at *1 (N.D. Cal. Aug. 9, 2016).

[175] *See* Huttinger Decl., Ex. 1, Declaration of Trevor K. Scheetz, submitted herewith.

[176] *See* Fed. R. Civ. P. 37(c)(1) (party cannot use, at trial, information it refused to disclose in discovery). Sanofi's argument that the scope of its narrow waiver has already been adjudicated, (Doc. No. 724 at 34 (Sanofi's Br.), misses the point: not whether Sanofi waived privilege more broadly, but rather whether the jury should be told, truthfully, about the scope of Sanofi's waiver.

[177] *In re Keeper of Records (Grand Jury Subpoena Addressed to XYZ Corp.)*, 348 F.3d 16, 24 (1st Cir. 2003).

privilege.[178] None addressed the circumstance here, where a jury will receive only a partial understanding of claimed subjective beliefs through an incomplete waiver of privilege. Instead, and in at least two instances, courts facing analogous circumstances concluded that allowing plaintiffs to "comment" on the scope of privilege waivers in the case was fair, necessary, or both in order to avoid misleading the jury as to the evidence presented at trial.[179]

Sanofi's motion should be denied or, in the alternative, deferred to trial.

## IV. CONCLUSION

For the foregoing reasons, the Court should deny Sanofi's motions *in limine* or, where appropriate, defer consideration to trial.

---

[178] *E.g.*, *Akamai Techs., Inc. v. Limelight Networks, Inc.*, 614 F. Supp. 2d 90, 110 n.20 (D. Mass. 2009); *Astra Pharm. Prods., Inc. v. Beckman Instruments, Inc.*, 1983 WL 51933, at *4 (D. Mass. Mar. 24, 1983), *aff'd*, 718 F.2d 1201 (1st Cir. 1983).

[179] *HIV*, 2023 WL 5670808, at *6 ("it is fair for Plaintiffs to be able to comment"); Huttinger Decl. Ex. 8, *In re Glumetza*, *supra* at 50 (fact that defendants intended to rely heavily on evidence produced via incomplete waiver of privilege "requires that that comment be allowed for fairness purposes. Otherwise, it's just too misleading.").

Dated: October 1, 2026

Respectfully submitted,

/s/ Thomas M. Sobol
Thomas M. Sobol (BBO #471770)
Kristen A. Johnson (BBO #667261)
Rachel A. Downey (BBO #706639)
William H. Huttinger (*pro hac vice*)
Rebekah Glickman-Simon (BBO #708043)
Michael H. Lavine (BBO #717587)
HAGENS BERMAN SOBOL SHAPIRO LLP
1 Faneuil Hall Square, 5th Floor
Boston, MA 02109
Telephone: (617) 482-3700
tom@hbsslaw.com
kristenj@hbsslaw.com
racheld@hbsslaw.com
henry.huttinger@hbsslaw.com
rebekahgs@hbsslaw.com
michael.lavine@hbsslaw.com

*Counsel for Plaintiffs FWK Holdings, LLC, Meijer, Inc., Meijer Distribution, Inc., AmerisourceBergen Corporation (n/k/a Cencora, Inc.), AmerisourceBergen Drug Corporation, H.D. Smith, LLC, Valley Wholesale Drug Company, LLC, Smith Medical Partners, LLC, ASD Specialty Healthcare, Inc., Cardinal Health, Inc., The Harvard Drug Group, L.L.C., and McKesson Corporation*

John D. Radice (*pro hac vice*)
April D. Lambert (*pro hac vice*)
Luke Smith (*pro hac vice*)
RADICE LAW FIRM, P.C.
475 Wall Street
Princeton, NJ 08540
Telephone: (646) 245-8502
jradice@radicelawfirm.com
alambert@radicelawfirm.com
lsmith@radicelawfirm.com

Joseph M. Vanek (BBO #551083)
Greg Shinall (*pro hac vice*)
Trevor K. Scheetz (*pro hac vice*)
Allison G. Margolies (*pro hac vice*)

SPERLING KENNY NACHWALTER
321 North Clark Street, 25th Floor
Chicago, IL 60654
Telephone: (312) 641-3200
jvanek@sperlingkenny.com
shinall@sperlingkenny.com
tscheetz@sperlingkenny.com
amargolies@sperlingkenny.com

*Counsel for Plaintiffs FWK Holdings, LLC., Meijer, Inc., and Meijer Distribution, Inc.*

Bruce E. Gerstein (*pro hac vice*)
Samuel E. Bonderoff (*pro hac vice*)
GARWIN GERSTEIN & FISHER LLP
88 Pine St., 10th Floor
New York, NY 10005
Telephone: (212) 395-0055
bgerstein@garwingerstein.com
sbonderoff@garwingerstein.com

Susan Segura (*pro hac vice*)
SMITH SEGURA RAPHAEL & LEGER LLP
221 Ansley Blvd.
Alexandria, LA 71303
Telephone: (318) 445-4480
ssegura@ssrllp.com

*Counsel for Plaintiffs Burlington Drug Company, Inc., Dakota Drug, Inc., J M Smith Corporation d/b/a Smith Drug Company, North Carolina Mutual Wholesale Drug Company, Prescription Supply, Inc., and Value Drug Company*

Peter R. Kohn (*pro hac vice*)
FARUQI & FARUQI, LLP
One Penn Center, Suite 1550
1617 John F. Kennedy Boulevard
Philadelphia, PA 19103
Telephone: (215) 277-5770
pkohn@faruqilaw.com

*Counsel for Plaintiffs RDC Liquidating Trust, by and through its trustee, Advisory Trust Group LLC, and MLI Rx LLC*

**CERTIFICATE OF SERVICE**

I hereby certify that this document filed through the CM/ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) on October 1, 2026.

Dated: October 1, 2026

*/s/ Thomas M. Sobol*
Thomas M. Sobol