UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

In re LANTUS DIRECT PURCHASER ANTITRUST LITIGATION ) Civil No. 16-12652-LTS

FIRST MEMORANDUM AND ORDER ON PROPOSED
VOIR DIRE, JURY INSTRUCTIONS, AND VERDICT FORM

October 21, 2026

SOROKIN, J.

Trial in this antitrust action is slated for January 2027. Pursuant to the governing pretrial schedule, the parties submitted in late July their proposed voir dire questions, jury instructions, and verdict forms, along with memoranda addressing disputed issues bearing on the proposals. After reviewing those materials, the Court held a conference with the parties on September 15, 2026. That conference marked the start of a collaborative process concerning how the Court will conduct jury selection and trial in this matter. The case is complex, and its procedural history long. It is not a case in which the jury instructions are straightforwardly derived from standard model instructions or those used during prior trials over which this Court presided, nor is it one in which the legal issues and context can be explained to laypersons in a few pages. Further conversations with counsel, and ongoing consideration by the Court, will be necessary.

As the Court explained to the parties, it intends to proceed step by step. To that end, the parties identified several key questions as to which resolution by (or, at least, guidance from) the Court in the short term would be especially helpful. Those questions are the subject of this Memorandum and Order.[1]

[1] The Court writes primarily for the parties. For background on the case and its context, interested readers may review the First Circuit's decision rendered earlier in this action. In re Lantus Direct Purchaser Antitrust Litig., 950 F.3d 1 (1st Cir. 2020).

## I. BIFURCATION AND OTHER LOGISTICS

Though the parties have not included it in their list of issues in need of resolution, whether to bifurcate the liability and damages portions of the trial is a question that the Court discussed with counsel during the recent conference. See Doc. No. 737.[2] Because it impacts the overall structure of the trial, the Court addresses this question now.

The Purchasers propose an undivided trial that encompasses liability and damages. They envision jurors specifying damages for any plaintiff as to which the Purchasers have met their burden of proof, then turning to assess Sanofi's affirmative defense. Doc. No. 706 at 7–8. Sanofi urges the Court to bifurcate, contending "it would be prejudicial and wasteful for the jury to attempt damages calculations before Sanofi were to be found liable." Doc. No. 705 at 15.

This Court has "wide latitude in matters concerning the ordering of proof and the presentation of evidence." Morales Feliciano v. Rullán, 378 F.3d 42, 57 (1st Cir. 2004). In exercising its discretion, the Court aims to "avoid delay" and make efficient use of "scarce judicial resources" including "judge and jury time" (among other considerations). United States v. Rivera-Carrasquillo, 933 F.3d 33, 44–45 (1st Cir. 2019). Having considered the parties' competing proposals, the Court finds that the Purchasers' is the better one.

The default practice in civil cases tried in this Court (and, as far as the undersigned is aware, in most others as well) is a single trial during which jurors receive evidence on liability and damages all at once. Any prejudice that might accrue to a typical defendant from proceeding in this manner can be ameliorated by limiting instructions. In civil cases over which this Court presides, it gives such instructions during trial (when damages evidence is presented), after the evidence concludes (in its final charge), or (often) at both times. The Court intends to give such

[2] Citations to "Doc. No. __ at __" reference items filed on the Court's electronic docket ("ECF") using the document and page numbering that appears in the ECF headers.

instructions in this case, using language it commonly employs and will share with the parties in advance of trial.[3] Because "[a] jury is presumed to follow its instructions," Weeks v. Angelone, 528 U.S. 225, 234 (2000), the Court finds that Sanofi's concerns about possible prejudice will be resolved by directives to the jury concerning the limited purpose and role of damages evidence.

Moreover, any potential prejudice to Sanofi is also vastly outweighed by the efficiency of a single, uninterrupted trial that culminates in one deliberation. This is so even in mine-run civil cases. Cf. Rivera-Carrasquillo, 933 F.3d at 45 (noting "judges must keep the proceedings moving," including because "district courts have heavy caseloads and jurors have family and work obligations"). But it is especially true here. In what will be a lengthy and complex trial, Sanofi's primary defense to liability turns on what it knew and intended at the time it listed the Pen Patents in the Orange Book. Cf. In re Lantus, 950 F.3d at 12 (discussing "defense to antitrust liability where the defendant's action was taken as part of a good faith, reasonable attempt to comply with a regulatory scheme"). This two-pronged defense will require a finding of fact by the jury as to whether Sanofi acted in good faith and a legal determination by the Court as to whether Sanofi acted reasonably. The bifurcated proceeding Sanofi proposes would feature a hiatus for jurors of indeterminate length. The jury would: 1) hear liability evidence, including evidence pertinent to Sanofi's defense; 2) receive instructions on the law, but not addressing damages; 3) retire to deliberate; 4) return a verdict on liability and (if necessary) the aspects of Sanofi's defense that raise fact questions; and then 5) be sent home (but not excused from further

[3] Sanofi proposes language for such an instruction. See Doc. No. 704-1 at 139 (including in D-54 language directing jurors that providing damages instructions does not suggest Purchasers should prevail on liability). The language, per Sanofi, is included in an ABA Model Jury Instruction for use in civil antitrust cases. Id. at 139 n.264. This suggests the practice of this Court in general civil cases carries over to trials like this one often enough to have yielded a model instruction addressing damages evidence in a non-bifurcated proceeding.

service) for however long it takes the parties to brief, and the Court to resolve, the legal prong of Sanofi's defense. At the recent conference, Sanofi agreed that the break in proceedings could last two weeks or longer.

During that time, jurors would remain under oath and subject to the standard restrictions that apply during any trial, bound by the Court's directives that they avoid media reporting on the case and not otherwise research or discuss it. Thereafter, if Sanofi were found liable and its defense were to fail, trial would resume. The same jury would be called back to the courthouse to hear damages evidence, receive more instructions from the Court, and deliberate again. The Court finds that such a protracted process, besides being inefficient, would pose an enormous and unwarranted inconvenience to the jurors serving in this case.[4] Nothing in the parties' submissions suggests that this case warrants placing such extraordinary demands on the jurors (or the Court). Sanofi's request for bifurcation is DENIED.

As to the proper sequencing of the final instructions and jury questions to be used in the single trial, the Court has considered both parties' proposals. See, e.g., Doc. No. 704-2 at 4, 6 (asking in Question 4 which Purchasers have proven overcharges and in Question 5 seeking the amount of overcharges as to each), with Doc. No. 704-3 at 3–4, 6–7 (asking in Question 6 which Purchasers have proven overcharges and then in Question 10 seeking the amounts). Because it will simplify the jurors' task and prevent the possibility of a damages award being erroneously estimated for a plaintiff as to whom no resulting harm was found, the Court will employ a modified version of the Purchasers' proposal. That is, it will ask in a single question—followed

[4] Adopting such a process would also complicate jury selection, as the Court would need to explain the bifurcation and what it might mean in terms of trial scheduling to all members of the venire before it could evaluate claims of hardship by individual prospective jurors. It seems a virtual certainty that bifurcation would substantially increase the number of jurors for whom serving on this jury would pose a hardship.

by a single list of all remaining plaintiff companies—whether overcharges have been proven as to each Purchaser and, if so, in what amount.

One other logistical matter that arose during the Court's conference with the parties warrants clarification. In discussing jury selection, the Court spoke generally about how many jurors would be empaneled. The Court raised the possibility of empaneling twelve jurors plus some alternates, largely due to the anticipated length of this trial. No party objected to doing so, though both wished to weigh in on the appropriate number.

After further review following the conference, however, the Court has determined that it will not empanel more than twelve jurors. The governing rules do not allow for alternate jurors in civil cases, as similar rules applicable in criminal trials do. Compare Fed. R. Civ. P. 48(a) (limiting number of jurors to "at least 6 and no more than 12," and requiring that "each juror must participate in the verdict unless excused" for good cause), with Fed. R. Crim. P. 24(c) (allowing for alternate jurors and establishing procedures governing their selection). Thus, the Court intends to empanel twelve jurors, all of whom will deliberate (unless any are excused mid-trial for good cause). Sanofi will have three peremptory challenges; the Purchasers will be "considered as a single party for the[se] purposes" and will likewise have three peremptory challenges. 28 U.S.C. § 1870; Fed. R. Civ. P. 47(b).

Having cleared the path of these preliminary matters, the Court now turns to the four issues identified by the parties in their joint, post-conference submission. Doc. No. 737.

## II. IMPROPER LISTING AND EXCLUSIONARY CONDUCT

The first disagreement the parties ask the Court to resolve concerns the effect of prior rulings in this case. Both the First Circuit and this Court have found as a matter of law that Sanofi improperly submitted, for listing in the Orange Book, patents that neither "claim[ed] nor even mention[ed] insulin glargine or the Lantus SoloSTAR." In re Lantus, 950 F.3d at 10;

accord Doc. No. 679 at 2 n.4, 3, 8; Doc. No. 657 at 11–12. The Purchasers urge that these determinations compel a finding that Sanofi engaged in exclusionary conduct,[5] satisfying one of the elements of the monopoly claim.[6] See Doc. No. 704-1 at 121–22; Doc. No. 706 at 7, 20–23. Sanofi disagrees, contending that the jury must still decide whether the improper listings amounted to exclusionary conduct. See Doc. No. 705 at 17.

At summary judgment, the Court adopted the Magistrate Judge's recommendation, which stopped short of adopting the position the Purchasers advance. Doc. No. 679 at 2 n.4; see Doc. No. 657 at 12–13 (concluding that exclusionary conduct required showing of willfulness, which "depends in part on the outcome of [Sanofi's] regulatory compliance defense"). This ruling is the primary basis for Sanofi's current position. See Doc. No. 705 at 22; Doc. No. 741 at 10–12. The Court's closer review of this question now, as it contemplates how to craft appropriate jury instructions and verdict questions, has caused it to reevaluate the logical effects of the binding determination that Sanofi's submission of the Pen Patents was "improper" as a matter of law. The Court now finds that Sanofi's position blurs the concepts of causation, good faith, and

[5] The parties employ different terminology, with the Purchasers referring to the conduct as "exclusionary," and Sanofi, "anticompetitive." It is not clear whether this is a distinction with (or without) a difference. For now, the Court uses the Purchasers' term, noting the First Circuit also invoked it. In re Lantus, 950 F.3d at 13. If warranted, the Court will revisit this term as its pretrial conferral with the parties continues.

[6] The parties disagree about how to enumerate the elements of such a claim. Compare Doc. No. 704-1 at 89 (listing in P-33 two elements, taken directly from First Circuit caselaw), with id. at 90 (listing in D-33 four elements derived from ABA Model Jury Instructions). This dispute appears to focus more on form than substance. For example, both parties agree that the Purchasers must prove that they were harmed, and that their harm was caused by Sanofi's challenged conduct. (Sanofi lists this as a discrete element of the monopoly claim, while the Purchasers address it in separate instructions.) And both parties agree that the Purchasers must prove that Sanofi had monopoly power in the relevant market, though the Purchasers articulate that as a single element and Sanofi subdivides it into "relevant market" and "monopoly power" components. The Court will finalize how to list the elements later, but it appears presently that there is not a meaningful dispute on this front.

monopoly power with the "exclusionary conduct" element of the monopoly claim in a manner that is likely to confuse jurors and muddle their deliberations. The Purchasers' position avoids that risk while ensuring that both parties are held to their burdens on each element of their claims and defenses. The Court will explain.

One element of the monopoly claim will require the Purchasers to prove that Sanofi "acquired or maintained" its monopoly power in the relevant market "by improper means."[7] In re Lantus, 950 F.3d at 7. It will not be disputed at trial that "it was improper for Sanofi to have submitted" the Pen Patents "for listing in the Orange Book as a drug claiming either insulin glargine or the Lantus SoloSTAR." Id. at 8 (emphasis added). This is the law of the case. And, of course, Sanofi does not contend that it submitted the Pen Patents for listing inadvertently. It intended the submissions (generally speaking), and Sanofi agrees that the Purchasers need not prove specific intent as an element of their monopoly claim. Doc. No. 705 at 22.

Pursuant to the regulatory framework at issue, the Pen Patent listings created an obstacle for any company hoping to launch a product that would compete with the SoloSTAR, and they supplied Sanofi "with the ability to trigger an automatic, thirty-month suspension" of approval for such a product. In re Lantus, 950 F.3d at 3–4. In these ways, the listings altered the ordinary competitive landscape, tilting the playing field in Sanofi's favor. Such a shift would not be considered exclusionary, were it accomplished by proper adherence to the relevant statutes and regulations via the submission of patents eligible for listing in the Orange Book. But gaining the

[7] A separate element (which is not the focus of the issues addressed at this time) will require the Purchasers to first prove that Sanofi in fact had monopoly power in a relevant market. Absent such proof, jurors will not reach the question of "improper means." To the extent Sanofi suggests that the "improper means" element itself requires proof of "a relevant market" and Sanofi's "power in that market," e.g., Doc. No. 677 at 23, the Court finds no basis to transplant components of the first element into the Purchasers' burden of proving the second.

same competitive edge via improper submissions of ineligible patents is conduct that "reasonably appears capable of" obstructing "the achievement of competition's basic goals." Town of Concord v. Bos. Edison Co., 915 F.2d 17, 21–22 (1st Cir. 1990) (Breyer, J.); see In re ACTOS Antitrust Litig., 783 F. Supp. 3d 749, 776 (S.D.N.Y. 2025) (describing second element as requiring proof of conduct that was "improper" and had or was "likely to have the effect of . . . excluding competition" (citation modified)); see also Barry Wright Corp. v. ITT Grinnell Corp., 724 F.2d 227, 230 (1st Cir. 1983) (Breyer, J.) (equating "improper" with "exclusionary" for purposes of monopoly claim under § 2 of Sherman Act).

Sanofi has resisted this conclusion mainly by conflating this element with others that will require proof and resolution at trial. See Doc. No. 677 at 22–24; see also supra, note 7. For example, whether the improper listings caused delays in approval of competing products is a separate element that everyone agrees the Purchasers will have to prove. See Doc. No. 706 at 23. But proof on this distinct question is not also required to establish exclusionary conduct; Sanofi has cited no authority suggesting otherwise. And Sanofi's specific intent in making the submissions, though central to its regulatory-compliance defense, is not part of the "exclusionary conduct" element (or the Purchasers' burden more generally). Cf. In re Lantus, 950 F.3d at 13 (specifying that regulatory compliance is a "defense to antitrust liability," "to be proven by Sanofi"); Times-Picayune Publ'g Co. v. United States, 345 U.S. 594, 626 (1953) (noting "the completed offense of monopolization under" section 2 of the Sherman Act "demands only a general intent to do the act," not "a specific intent to destroy competition").

These questions of causation and intent will be put to the jury, which will assess whether the Purchasers have established the requisite causal link (the nature of which the Court will explore next)—and, if so, whether Sanofi has established it acted out of a reasonable, good-faith

effort to comply with governing law. Thus, a determination that the improper listings establish "exclusionary conduct" as a matter of law is not foreclosed by or in tension with the First Circuit's observation that the law does not impose strict liability on Sanofi for those listings. In re Lantus, 950 F.3d at 11. The exclusionary nature of the listings alone is not sufficient to impose liability, and no one argues otherwise. Rather, liability will arise only if the Purchasers establish the other elements of their claim (including monopoly power and causation), and if Sanofi cannot establish the elements of its defense.

The Court's revised assessment of the "exclusionary conduct" element, besides being supported by law and logic, also has the virtue of simplifying the jurors' tasks in this case. Each element and defense—monopoly power, causation, and regulatory compliance—will present a distinct inquiry. The party with the burden of proof as to each question will be clear. Sanofi's view, on the other hand, blurs the inquiry by scattering similar concepts throughout multiple elements. This risks confusing jurors about who bears the burden of proof as to which issues, and how the assessment of any causation or intent questions nested within an element of the Purchasers' claims relates to the same questions in the context of Sanofi's defense.

For these reasons, the Court revises its summary-judgment ruling insofar as the "exclusionary conduct" element is concerned and adopts the Purchasers' position. The findings in this case by the First Circuit and on summary judgment that Sanofi improperly submitted the Pen Patents for listing in the Orange Book necessarily mean that Sanofi engaged in exclusionary conduct. That element of the Purchasers' claim is therefore resolved as a matter of law.

## III. CAUSATION

The second key dispute identified by the parties concerns the legal standard for proving causation and the proper allocation of the burden of proof as to that element. Both parties seek

to sculpt the Court's instructions on causation such that it will dovetail with important aspects of their theories of the case. Neither party's proposal is quite right.

In its earlier decision in this case, the First Circuit rejected Sanofi's argument that the Purchasers had not plausibly alleged facts to support a finding of causation, stating: "Antitrust causation . . . requires only that the complained-of activity be a 'material' or 'substantial' cause of the injury." In re Lantus, 950 F.3d at 14. In that regard, the Circuit cited a leading treatise on antitrust law and highlighted (parenthetically) the following language: "It is . . . enough that the antitrust violation contributes significantly to the plaintiff's injury, even if other factors amounted in the aggregate to a more substantial cause." Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law: An Analysis of Antitrust Principles and Their Application ¶ 338a (4th ed. 2019).

With those principles as a starting point, the Court turns to Sanofi's proposal. In its memorandum, its proposed jury instructions, and its proposed verdict form, Sanofi urges the Court to require proof that the Pen Patent listings "independently" triggered the thirty-month stay and caused the Purchasers' harm. See Doc. No. 705 at 22 (invoking this term twice); Doc. No. 704-1 at 133–35 (defining "independent trigger" in D-52); Doc. No. 704-3 at 3 (Questions 4 and 5). Sanofi cites no authority for injecting the term "independently" in the causation instructions, nor does it reconcile its use of that term with its own later instruction requiring jurors to assess whether the listings were a "primary" cause of their harm. Doc. No. 704-1 at 136 (D-53). As the Purchasers argue, this aspect of Sanofi's causation instructions is likely to confuse jurors. Doc. No. 706 at 23–24. Because Sanofi has made no attempt to square its own instructions with one another, and the Court discerns no obvious means of doing so, neither the jury instructions nor

the verdict questions will describe the Purchasers' burden as requiring proof that the Pen Patent listings "independently" caused their harm.[8]

As for the Purchasers' proposal, even as revised, see Doc. No. 760-1 at 6–7, the main problem is their suggestion that the burden of proof as to causation should shift to Sanofi after they make a somewhat loosely defined, prima facie showing.[9] Doc. No. 704-1 at 126, 128; see Doc. No. 706 at 24; Doc. No. 737 at 2. The Court does not understand the law to support transforming the causation element into a quasi-affirmative defense in this way, at this stage of the proceedings. As Sanofi points out, the cases upon which the Purchasers rely—including an earlier decision in this case—generally evaluated causation at summary judgment. E.g., Doc. No. 657 at 21; In re Ranbaxy Generic Drug Application Antitrust Litig., 573 F. Supp. 3d 459, 468 (D. Mass. 2021). The moving party's burden in that context, in the face of a plaintiff's showing in support of an element of their claim, is not the same as a defendant's burden at trial.

To the extent the First Circuit once invoked the same concept outside the summary-judgment context, it did so in a way that stopped well short of announcing the rule the Purchasers propose here. See In re Neurontin Mktg. & Sales Pracs. Litig., 712 F.3d 21, 45 (1st Cir. 2013) (reviewing sufficiency of evidence supporting jury's finding of causation and considering

[8] The Court is also skeptical of instructing jurors that the Purchasers must prove the Pen Patent listings were the "primary" cause of their harm. See Doc. No. 704-1 at 136. The only support for such language comes from a recent antitrust case that presented distinct circumstances and arose under a different section of the Sherman Act. See id. (citing In re Amitiza Antitrust Litig., No. 21-cv-11057-MJJ). Notably, the relevant section of the ABA's Model Instructions for Civil Antitrust Cases—which Sanofi itself frequently cites, including in support of another portion of its causation instruction, see Doc. No. 704-1 at 136 n.258—speaks of "a material cause" and does not equate "material" with "primary."

[9] To the extent the Purchasers propose language that waters down their burden as to causation, the Court will not include such language in its instructions. E.g., Doc. No. 704-1 at 126 (including in P-48 an instruction that "there should be evidence" connecting Sanofi's listings to the Purchasers' injury); Doc. No. 760-1 at 4 (retaining same sentence in revised version).

whether defendant had done enough "to rebut" evidence supporting "causal inference" (citing BCS Servs. Inc. v. Heartwood 88, LLC, 637 F.3d 750, 757 (7th Cir. 2011), and its holding that a plaintiff need not "prove a series of negatives" or "offer evidence which positively excludes every other possible cause of the" harm (citation modified))). Rather, Neurontin summarizes familiar principles, most of which the parties here do not dispute: that a plaintiff need not prove the defendant's conduct was the sole cause of its harm; that a plaintiff need not disprove all other possible causes of its harm; that if a plaintiff adduces evidence that would permit (or even require) a jury to find that the defendant's conduct was a material and actual cause of its harm, then the defendant risks conceding the issue of causation unless it comes forth with evidence or argument in rebuttal.

This is not a matter of burden shifting or an affirmative defense. The burden of proving causation remains with the Purchasers. They must establish, by a preponderance of the evidence, that Sanofi's improper listings of the Pen Patents were an actual and material cause of their harm. Sanofi may seek to persuade the jury that the Purchasers have not satisfied that burden, including by offering evidence and argument that it views as undermining the Purchasers' evidence or argument as to this element. The same is true of every element as to which the Purchasers bear the burden (subject to challenge or rebuttal by Sanofi), and it is true of the elements of the regulatory-compliance defense as to which Sanofi bears the burden (subject to challenge or rebuttal by the Purchasers).

Finally, to the extent the Purchasers believe it "unnecessary" to ask jurors separately whether they have found causation as to Merck and Lilly (the two companies planning competing products during the relevant time), Doc. No. 706 at 25, the Court sees no problem with soliciting separate answers in this regard, just as it sees no problem with requiring jurors to

quantify damages that may not ultimately be adjudged (should Sanofi prevail on its defense). Instead of asking two causation questions, the Court intends to ask one, beneath which will appear sets of lines inviting a separate response for each of the two relevant companies.

In sum, the Court intends to instruct the jury that the Purchasers bear the burden of proving that Sanofi's improper listing of the Pen Patents was an actual and material cause of their injury. It will further explain that this element does not require the Purchasers to prove that the listings were the only cause or even the most substantial cause of their injury, and that it is not the Purchasers' obligation to disprove any or all other potential causes. Rather, in light of the record as a whole, they must establish that the listings were an actual cause—that is, all or some part of their injury would not have occurred but for the listings[10]—and that they were a material cause—that is, they contributed significantly to their injury. Such a standard is consistent with the First Circuit's decision in this case, the treatise on which it relies, and the ABA's model instruction on causation for cases like this one.

## IV. GOOD FAITH

The parties' remaining two questions for the Court relate to the contours of Sanofi's regulatory-compliance defense. The First Circuit discussed the elements of this defense earlier in this case, when it rejected both parties' positions concerning the impact of Sanofi's intent on its potential liability. See In re Lantus, 950 F.3d at 11–13 (expressing concern that Purchasers' view " would essentially [impose] strict liability for improper Orange Book submissions" and thereby "tilt the regulatory balance Congress sought in this bespoke scheme," but declining to

[10] The parties do not appear to meaningfully disagree about the need to instruct jurors about the hypothetical nature of the "but for" determination, and that they must consider what a reasonable, profit-maximizing-yet-law-abiding company in the position of Merck or Lilly would have done in the absence of the improper listings. See Doc. No. 704-1 at 131–34. The Court does not understand them to be seeking further guidance on this point now.

grant Sanofi "immunity if its proffered reading of the statute was objectively reasonable"). Instead, the First Circuit determined that Sanofi could defend itself by proving that the improper Orange Book "submission[s] w[ere] the result of a reasonable, good-faith attempt to comply with the Hatch Waxman scheme." Id. at 14.

The parties agree that this defense has two components, only one of which—Sanofi's good faith—presents a pure question of fact for the jury. See Doc. No. 704-1 at 145–48 (P-57 and D-57); see also In re ACTOS Antitrust Litig., 783 F. Supp. 3d 749, 782 (S.D.N.Y. 2025). The Court addresses that component first, then turns to the reasonableness inquiry that mixes facts with law.

The parties disagree about the legal standard defining Sanofi's burden of proving its subjective good faith and ask the Court to identify the question it intends to ask jurors concerning this prong of the defense.[11] See Doc. No. 737 at 3. The two disputed aspects of this component are: 1) whether Sanofi must prove that it submitted the Pen Patents for listing because of its good-faith (but mistaken) understanding of the law, or whether it can instead satisfy its burden by proving that its decision was not "solely" motivated by a desire to exclude competition; and 2) whether Sanofi must prove that it believed in good faith that the law required the relevant

[11] Though the parties address reasonableness before good faith, e.g., Doc. No. 704-1 at 145–60; Doc. No. 737 at 2–3, the Court addresses the two components in reverse order here and intends to do the same in its instructions and verdict form. The jury's finding as to good faith will dictate whether the Court must decide objective reasonableness. If the jury finds Sanofi's improper submissions were not good-faith attempts to comply with the governing regulations, then there will be no need for them to deliberate further regarding Sanofi's defense. In that circumstance, the Court will not need to assess reasonableness, because the defense requires Sanofi to establish both good faith and objective reasonableness. Thus, only if the jury finds that Sanofi has established good faith will it proceed to answer the questions bearing on the Court's determination of objective reasonableness. It will therefore be most efficient to explain good faith, and solicit a finding as to that question, first.

submissions, or whether it can instead satisfy its burden with evidence that it believed in good faith that the law permitted the submissions. Id.

On these matters, this Court has the benefit of the careful and instructive analysis articulated by another District Judge recently in a similar lawsuit the parties view as a "sister case" to this one. See In re ACTOS, 783 F. Supp. 3d at 782–83, 792, 794–95. There, the court described the good-faith inquiry as requiring an examination of "whether a defendant acted out of a subjective belief that its conduct was required by regulatory law, as opposed to for competitive reasons." Id. at 783 (citation modified). Where some evidence suggested the defendant "truly believed" it was obligated to act the way it did, but other evidence "could support an inference that" its aim was to delay a competing product, the ACTOS court concluded it was the jury's role to choose which of those conflicting motivations to credit. Id. at 792; accord id. at 794–95. The ACTOS court repeatedly emphasized the defendant's obligation to establish a genuine belief "that it was required by law to" take the challenged actions. Id. at 782 (emphasis added); see id. at 782–83 (using word "required" in this context at least four more times); id. at 792 (referencing three times belief that defendant "was required to" engage in challenged conduct); cf. id. at 794 (distinguishing between proof that defendant believed its view "was the correct interpretation" of relevant requirements and proof that it acted pursuant to "a colorable argument" that supported its action as part of "a strategy that would allow it to" suppress competition).

In sketching the contours of the good-faith requirement, the ACTOS court cited and reasoned consistently with the First Circuit's earlier decision in this case. E.g., id. at 782. The Circuit introduced its discussion of the regulatory-compliance defense with a quote from the leading antitrust treatise warning against punishing companies operating in regulated areas for

"conduct undertaken in a reasonable good faith effort to comply with" antitrust law and policies. In re Lantus, 950 F.3d at 12 (quoting Areeda & Hovenkamp, Antitrust Law ¶ 246a). It then highlighted precedent from other Courts of Appeals, including a Seventh Circuit case recognizing an antitrust defense arising from a company's "good faith adherence to regulatory obligations." Id. at 12–13 (emphasis added) (quoting MCI Commc'ns Corp. v. Am. Tel. & Tel. Co., 708 F.2d 1081, 1109–10 (7th Cir. 1983), and then citing twice statement in the same case describing "ideal" jury instruction as one allowing as a defense a "good faith" conclusion that challenged conduct was "required by" antitrust law or policy); see also S. Pac. Commc'ns Co. v. Am. Tel. & Tel. Co., 740 F.2d 980, 1009–10 (D.C. Cir. 1984) (endorsing and adopting MCI view of good faith as requiring proof defendant "actually made its decision at the time" based on its assessment of what relevant regulations required).

From all this, the Court resolves the parties' disputes concerning good faith by adopting a view that generally aligns with that of the Purchasers. As to the first issue, the Court rejects Sanofi's suggestion that it may avoid liability merely by showing that the suppression of competition was not the only reason it submitted the Pen Patents for listing.[12] Indeed, this limited defense would swallow the Sherman Act whole if it could be successfully wielded by any defendant who could identify a regulatory provision as one minor consideration among a host of other anticompetitive aims. On the other hand, Sanofi also need not prove that it had no other purpose in mind when it undertook the challenged conduct. To show that it decided to submit the Pen Patents "because of" its misinterpretation of the relevant regulatory landscape, it must

[12] Sanofi's argument mostly relies on selective quotations taken out of context from cases that generally support the Purchasers' view, or on general principles discussed in different contexts entirely. See, e.g., Doc. No. 705 at 28–29 (selectively quoting Southern Pacific, citing an earlier decision in ACTOS but not the more recent and analogous summary-judgment decision, and relying on cases discussing bad faith outside the antitrust context).

prove what most parties seeking to establish causation in a civil context must prove: that its mistaken understanding of the law was an actual and material cause of its decision. Nothing before the Court suggests a different standard should apply here, and providing jurors with one uniform definition of causation to apply throughout this case will avoid confusion.

As to the second issue, Sanofi has identified no authority suggesting a good-faith belief that its submissions were arguably "permitted by"—rather than were "required by"—the relevant regulations would shield it from liability. As noted, the word "required" permeates ACTOS and appears in the precedent from various jurisdictions upon which that analysis relied. Accordingly, to establish good faith, Sanofi will have to prove that a good-faith (if erroneous) belief about what the law required actually and materially caused it to submit the Pen Patents for listing.

In light of the foregoing, the Court presently anticipates asking the jury the following question, to be answered only if the jury finds the Purchasers have met their burden of proof as to all elements of their claims: "Has Sanofi proven by a preponderance of the evidence that it submitted the Pen Patents for listing in the Orange Book because it believed in good faith that the law required it to do so?" When instructing the jury on this question, the Court will direct that jurors apply the same causation standards articulated above and applicable to the Purchasers' case-in-chief. The Court will consider adjusting this language if necessary in response to any concerns or objections raised by the parties in the ordinary course of the pretrial proceedings and trial in this case.

## V. OBJECTIVE REASONABLENESS

Finally, the parties seek guidance concerning the other component of Sanofi's defense: the objective-reasonableness assessment that will be the Court's to make. On this, the First Circuit made the following observations: "An experienced and sophisticated drug manufacturer routinely works with such complexity [as that which is found in the governing regulatory

scheme]. And in this instance no close reader could have reasonably thought that submitting the [Pen Patent upon which the appeal focused] was so clearly proper as to obviate the need for inquiry and advice." In re Lantus, 950 F.3d at 14. It allowed, however, that "evidence about custom and practice in the industry" and "what if any legal opinions Sanofi sought and obtained before submitting the patent"—both factual questions—would bear on the reasonableness of the improper submission. Id. at 13; see In re ACTOS, 783 F. Supp. 3d at 782, 785–86.

At summary judgment, this Court agreed that material factual disputes precluded it from resolving the reasonableness question short of trial. Doc. No. 679 at 3–5. Now, the parties ask the Court to decide whether Sanofi will be required to "produce evidence of other industry participants' reason for submitting certain patents for Orange Book listing," and to identify the "specific factual question(s)" it will "put to the jury" concerning reasonableness. Doc. No. 737 at 2–3. Here, again, this Court is guided by the examination of these issues undertaken in ACTOS. See 783 F. Supp. 3d at 782–91, 793–94.

To be probative of reasonableness, evidence concerning industry practice must do more than state the number of similar patents others in the industry submitted for listing in the Orange Book. As the Court raised during its conference with the parties, the mere fact that other companies submitted similar patents could just as easily suggest an industry practice of exploiting a means of thwarting competition or a common, careless approach to submissions (neither of which would render reasonable Sanofi's incorrect view of the law) as it could evidence a shared misinterpretation of the relevant laws and regulations (and therefore support Sanofi's defense). Thus, "a highly relevant fact" is "why" the other companies made their submissions. Id. at 789. Without proof of that fact, evidence of what others in the industry were

doing in similar situations generally would not move the needle in Sanofi's favor on this component of its defense.[13]

The objective component, as to which Sanofi bears the burden of proof, requires it to show "that its misreading of the law was objectively reasonable," not that submitting the patents for listing was. Id. at 782. This distinction is subtle but crucial. The defense turns on whether Sanofi made its improper submissions in a reasonable (and good-faith) attempt to comply with governing regulations. It is, after all, termed the "regulatory-compliance defense." Proof of a prevailing industry practice that is not tied to a prevailing (but mistaken) industry belief that the practice was required by governing regulations does not establish what the defense demands. And so, the answer to the parties' question is "yes," Sanofi must supply evidence of the reason others in the industry acted as they did.[14]

---

[13] This view permeates the persuasive reasoning of the ACTOS court. E.g., 783 F. Supp. 3d at 782 (defining relevant factor as "whether others in the industry had adopted the same misinterpretation as evidenced by custom and practice" (citation modified)); id. at 785 (identifying "whether others in the industry shared defendant's misinterpretation of regulatory law, as evidenced by their past conduct"); id. at 789 (declining to find industry practice based on "conduct of a single actor" whose reasons for acting were unknown, and noting record supported "alternate explanations" for conduct of other cited companies such that court could not infer a shared misinterpretation of law). Similar considerations arise as to the other fact question bearing on reasonableness: "whether any legal opinions supported the defendant's misinterpretation," i.e., whether "the advice that lawyers were giving clients" established a "common or prevailing understanding of [the] industry" that rendered the defendant's "mistake . . . reasonable." Id. at 782, 791 (citation modified); see id. at 791 (declining at summary judgment to resolve this factor in defendant's favor where opinion "may have been outcome-driven as opposed to independent and impartial" and lawyer's comments suggested "his legal opinions were not the prevailing view").

[14] Though evidence that others acted similarly, without showing why, will not generally be probative of objective reasonableness, it might bear on good faith if Sanofi knew that other companies were submitting similar patents for listing and drew an (incorrect) inference about what the law required from circumstances that included such knowledge.

In light of the foregoing, the Court presently anticipates asking the jury the following two questions, to be answered only if the jury finds the Purchasers have met their burden of proof as to all elements of their claims and Sanofi has met its burden of proving good faith:

1. Has Sanofi proven by a preponderance of the evidence that, during the relevant period, other companies in the industry shared Sanofi's incorrect belief that the law required the Pen Patents to be submitted for listing in the Orange Book?

2. Has Sanofi proven by a preponderance of the evidence that, during the relevant period, lawyers were providing opinions to clients or others within the industry in which they advised that the law required the submission of patents such as the Pen Patents for listing in the Orange Book?

The Court will consider adjusting the foregoing language if necessary in response to any concerns or objections raised by the parties in the ordinary course of the pretrial proceedings and trial in this case. [15]

## VI. CONCLUSION & ORDER

To summarize, for the reasons expressed in the foregoing Memorandum, it is hereby ORDERED as follows:

1) Trial in this matter will not be bifurcated. Jurors will hear evidence on liability and damages in a single trial, then deliberate once and return a single verdict. The Court will prepare a special verdict form that includes instructions to jurors about how to proceed from each question depending on the answer given. One consolidated question concerning damages will ask jurors to indicate, as to each Purchaser, whether damages were proven and, if so, the amount of such damages.

2) The Court will empanel twelve jurors. All jurors who remain at the conclusion of the evidence will participate in deliberations. Both sides will have three peremptory challenges to exercise during jury selection.

3) The determination that Sanofi improperly submitted the Pen Patents for listing in the Orange Book compels a conclusion that the Purchasers have established exclusionary conduct as a matter of law. Sanofi's monopoly power, causation, and regulatory-compliance defense are distinct questions the jury will resolve. But the jury will not be asked to make any further determination concerning exclusionary conduct.

[15] The Court wishes to further address with the parties the wording, and the jury's role, as to Question 2.

4) The Purchasers bear the burden of proving that Sanofi's improper listing of the Pen Patents was an actual and material cause of their injury. The Court intends to instruct the jury in this regard as described above, and it will elicit separate responses as to Merck and Lilly via a single causation question on the verdict form.

5) To satisfy the subjective component of its defense, Sanofi must establish that its good-faith (if erroneous) belief about what the law required was an actual and material cause of its decision to submit the Pen Patents for listing in the Orange Book.

6) To satisfy the objective component of its defense, Sanofi must establish that its misreading of the law was reasonable. For industry-practice evidence to be probative in this regard, it must include evidence of the reason(s) others in the industry acted as they did. The Court will ask the jury two questions on the verdict form, using language included above, to address the two fact issues bearing on its assessment of reasonableness. The jury will answer those questions only if they resolve the subjective component of the defense in Sanofi's favor.

SO ORDERED.

/s/ Leo T. Sorokin
United States District Judge